## FALLBROOK IRRIGATION DISTRICT *v.* BRADLEY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF CALIFORNIA.

No. 355. Argued January 23, 24, 27, 1896. — Decided November 16, 1896.

In a suit, brought in a Circuit Court of the United States by an alien against a citizen of the State in which the court sits, claiming that an act about to be done therein by the defendant to the injury of the plaintiff, under authority of a statute of the State, will be in violation of the Constitution of the United States, and also in violation of the constitution of the State, the Federal courts have jurisdiction of both classes of questions; but, in exercising that jurisdiction as to questions arising

under the state constitution, it is their duty to be guided by and follow the decisions of the highest court of the State; (1), as to the construction of the statute; and (2), as to whether, if so construed, it violates any provision of that constitution. *Loan Association* v. *Topeka*, 20 Wall. 655, shown to be in harmony with this decision.

The statute of California of March 7, 1887, to provide for the organization and government of irrigation districts, and to provide for the acquisition of water and other property, and for the distribution of water thereby for irrigation purposes, and the several acts amendatory thereof having been clearly and repeatedly decided by the highest court of that State not to be in violation of its constitution, this court will not hold to the contrary.

*Davidson* v. *New Orleans*, 96 U. S. 97, 104, cited and affirmed to the point that "whenever by the laws of a State or by state authority a tax, assessment, servitude or other burden is imposed upon property for the public use, whether it be for the whole State or of some more limited portion of the community, and those laws provide for a mode of confirming or contesting the charge thus imposed, in the ordinary courts of justice, with such notice to the person, or such proceeding in regard to the property as is appropriate to the nature of the case, the judgment in such proceedings cannot be said to deprive the owner of his property without due process of law, however obnoxious it may be to other objections."

There is no specific prohibition in the Federal Constitution which acts upon the States in regard to their taking private property for any but a public use.

What is a public use, for which private property may be taken by due process of law, depends upon the particular facts and circumstances connected with the particular subject-matter.

The irrigation of really arid lands is a public purpose, and the water thus used is put to a public use; and the statutes providing for such irrigation are valid exercises of legislative power.

The land which can be properly included in any irrigation district under the statutes of California is sufficiently limited to arid, unproductive land by the provisions of the acts.

Due process of law is furnished, and equal protection of the law given in such proceedings, when the course pursued for the assessment and collection of taxes is that customarily followed in the State, and when the party who may be charged in his property has an opportunity to be heard.

The irrigation acts make proper provisions for a hearing as to whether the petitioners are of the class mentioned or described in them; whether they have complied with the statutory provisions; and whether their lands will be benefited by the proposed improvement. They make it the duty of the board of supervisors, when landowners deny that the signers of a petition have fulfilled the requirements of law, to give a hearing or hearings on that point. They provide for due notice of the proposed

presentation of a petition; and that the irrigation districts when created in the manner provided are to be public corporations with fixed boundaries. They provide for a general scheme of assessment upon the property included within each district, and they give an opportunity to the taxpayer to be heard upon the questions of benefit, valuation and assessment; and the question as to the mode of reaching the results, even if in some cases the results are inequitable, does not reach to the level of a Federal constitutional problem. In all these respects the statutes furnish due process of law, within the meaning of that term as used in the Fourteenth Amendment to the Constitution of the United States.

This was an appeal from the United States Circuit Court for the Southern District of California. The case is reported in 68 Fed. Rep. 948. The action was commenced in that court by defendants in error, the plaintiffs below, for the purpose of procuring an injunction restraining defendant Tomlins, the collector of the irrigation district, from giving a deed to it of the premises belonging to plaintiff, Mrs. Bradley, based on a sale of her land made by the collector for the non-payment of a certain assessment upon such lands under the act incorporating the irrigation district, and to set aside such assessment, and for other relief.

The following, among other facts, were set up in the plaintiffs' second amended bill in equity : The plaintiffs are aliens and subjects of Great Britain, residing in San Diego County, California. The irrigation district is a corporation organized pursuant to the laws of California, and doing business at Fallbrook, San Diego County. Matthew Tomlins was the collector of the corporation at the time of the commencement of the suit, and it has been doing business as and claims to be a corporation under " An act providing for the organization and government of irrigation districts, and to provide for the acquisition of water and other property, and for the distribution of water thereby for irrigation purposes," approved March 7, 1887, as such act has been since amended.

The original act, which is commonly known as the Wright Act, and was so cited by counsel in their arguments, was enacted on the 7th of March, 1887, and will be found in the laws of California, at page 29. It contained 47 sections.

Sections 1, 2, 3 and 4 were amended by an act of March 20,

1891, Laws of 1891, page 142, so as to read as in that act set forth.

Sections 5, 6, 7, 8 and 9 stand as originally enacted.

Section 10 was amended by the act of February 16, 1889, Laws of 1889, page 15, so as to read as in that act set forth.

Sections 11 and 12 were amended by the said act of March 20, 1891, so as to read as in that act set forth.

Sections 13 and 14 stand as originally enacted.

Section 15 was amended by another act of March 20, 1891, Laws of 1891, page 147, so as to read as in that act set forth.

Section 16 remains as originally enacted.

Section 17 was amended by the act of March 11, 1893, Laws of 1893, page 175, so as to read as in that act set forth.

Section 18 was amended by the act of March 21, 1891, Laws of. 1891, page 244, so as to read as in that act set forth.

Sections 19, 20 and 21 remain as originally enacted.

Section 22 has been twice amended : (1) by the said act of February 16, 1889, Laws of 1889, page 15 : (2) by the said act of March 20, 1891, Laws of 1891 page 147. It now stands as so amended in 1891.

Section 23 was amended by said act of March 20, 1891, Laws of 1891, page 147. It now reads as in that act set forth.

Sections 24, 25 and 26 were · amended by the act of March 21, 1891, Laws of 1891, page 244. They now read as in that act set forth.

Section 27 of said act was amended by the act of February 16, 1889, Laws of 1889, page 15. It now reads as so amended.

Sections 28, 29, 30, 31, 32, 33 and 34 stand as originally enacted.

Section 35 was amended by said act of March 20, 1891, Laws of 1891, page 142. It now reads as so amended.

Sections 36, 37, 38, 39, 40 and 41 stand as originally enacted.

Section 42 was amended by the act of March 20, 1891, Laws of 1891, page 142. It now reads as so amended.

Sections 43, 44, 45, 46 and 47 have not been changed.

The material sections of the act, as amended by the other acts just stated, are set forth in the margin herein.[1]

The legislature also passed two acts, approved February 16, 1889, called, respectively, the "Inclusion" and the "Exclusion" act, by which means were provided, in the first

---

[1] "SEC. 1. Whenever fifty, or a majority of the holders of title or evidence of title, to lands susceptible of one mode of irrigation from a common source and by the same system of works, desire to provide for the irrigation of the same, they may propose the organization of an irrigation district, under the provisions of this act, and when so organized such district shall have the powers conferred, or that may hereafter be conferred, by law upon such irrigation districts. The equalized county assessment roll next preceding the presentation of a petition for the organization of an irrigation district, under the provisions of this act, shall be sufficient evidence of title for the purposes of this act.

"SEC. 2. A petition shall first be presented to the board of supervisors of the county in which the lands, or the greatest portion thereof, is situated, signed by the required number of holders of title, or evidence of title, of such proposed district, evidenced as above provided, which petition shall set forth and particularly describe the proposed boundaries of such district, and shall pray that the same may be organized under the provisions of this act. The petitioners must accompany the petition with a good and sufficient bond, to be approved by the said board of supervisors, in double the amount of the probable cost of organizing such district, conditioned that the bondsmen will pay all the said costs in case said organization shall not be effected. Such petition shall be presented at a regular meeting of the said board, and shall be published for at least two weeks before the time at which the same is to be presented, in some newspaper printed and published in the county where said petition is presented, together with a notice stating the time of the meeting at which the same will be presented; and if any portion of such proposed district lie within another county or counties, then said petition and notice shall be published in a newspaper published in each of said counties. When such petition is presented, the said board of supervisors shall hear the same and may adjourn such hearing from time to time, not exceeding four weeks in all; and on the final hearing may make such changes in the proposed boundaries as they may find to be proper, and shall establish and define such boundaries : *Provided*, That said board shall not modify said boundaries so as to except from the operation of this act any territory within the boundaries of the district proposed by said petitioners which is susceptible of irrigation by the same system of works applicable to the other lands in such proposed district; nor shall any lands which will not, in the judgment of the said board, be benefited by irrigation by said system be included within such district : *Provided*, That any person whose lands are susceptible of irrigation from the same source may, in the discretion of the board, upon application of the owner to said board, have such

named act, for including lands within an irrigation district which had not been included in the petition when first presented to the board of supervisors; and in the second named act, for excluding from a district already formed some portion of the land which then formed part of such district. An

---

lands included in said district. Said board shall also make an order dividing said district into five divisions, as nearly equal in size as may be practicable, which shall be numbered first, second, third, fourth and fifth, and one director, who shall be a freeholder in the division and an elector and resident of the district, shall be elected by each division : *Provided,* That if a majority of the holders of title, or evidence of title, evidenced as above provided, petition for the formation of a district, the board of supervisors may, if so requested in the petition, order that there may be either three or five directors, as said board may order, for such district, and that they may be elected by the district at large. Said board of supervisors shall then give notice of an election to be held in such proposed district, for the purpose of determining whether or not the same shall be organized under the provisions of this act. Such notice shall describe the boundaries so established, and shall designate a name for such proposed district, and said notice shall be published for at least three weeks prior to such election in a newspaper published within said county; and if any portion of such proposed district lie within another county or counties, then said notice shall be published in a newspaper published within each of said counties. Such notice shall require the electors to cast ballots which shall contain the words 'Irrigation District — Yes,' or 'Irrigation District — No,' or words equivalent thereto, and also the names of persons to be voted for to fill the various elective offices hereinafter prescribed. No person shall be entitled to vote at any election, held under the provisions of this act, unless he shall possess all the qualifications required of electors under the general election laws of this State.

"SEC. 3. Such election shall be conducted as nearly as practicable in accordance with the general laws of this State : *Provided,* That no particular form of ballot shall be required. The said board of supervisors shall meet on the second Monday next succeeding such election, and proceed to canvass the votes cast thereat, and if upon such canvass it appear that at least two-thirds of all the votes cast are 'Irrigation District — Yes,' the said board shall, by an order entered on its minutes, declare such territory duly organized as an irrigation district, under the name and style theretofore designated, and shall declare the persons receiving, respectively, the highest number of votes for such several offices to be duly elected to such offices. And no action shall be commenced or maintained, or defence made, affecting the validity of the organization, unless the same shall have been commenced or made within two years after the making and entering of said order. Said board shall cause a copy of such order, duly certified, to be immediately filed for record in the office of the county recorder of each

examination of those acts does not become material in this case.

The plaintiff, Mrs. Bradley, is the owner of certain real estate described in complainants' bill, which is included within

---

county in which any portion of such lands are situated, and must also immediately forward a copy thereof to the clerk of the board of supervisors of each of the counties in which any portion of the district may lie; and no board of supervisors of any county, including any portion of such district, shall, after the date of the organization of such district, allow another district to be formed including any of the lands in such district, without the consent of the board of directors thereof; and from and after the date of such filing, the organization of such district shall be complete, and the officers thereof shall be entitled to enter immediately upon the duties of their respective offices, upon qualifying in accordance with law, and shall hold such offices respectively until their successors are elected and qualified. For the purposes of the election above provided for, the said board of supervisors must establish a convenient number of election precincts in said proposed district, and define the boundaries thereof, which said precincts may thereafter be changed by the board of directors of such district. In any district the board of directors thereof may, upon the presentation of a petition therefor, by a majority of the holders of title or evidence of title of said district, evidenced as above provided, order that on and after the next ensuing general election for the district there shall be either three or five directors, as said board may order, and that they shall be elected by the district at large, or by divisions, as so petitioned and ordered; and after such order such directors shall be so elected."

(Sections 4 to 10, inclusive, provide for the election of officers of the company and for their giving bonds, and are not material here.)

"SEC. 11. On the first Tuesday in March next following their election, the board of directors shall meet and organize as a board, elect a president from their number and appoint a secretary, who shall each hold office during the pleasure of the board. The board shall have the power, and it shall be their duty to manage and conduct the business and affairs of the district; make and execute all necessary contracts; employ and appoint such agents, officers and employés as may be required, and prescribe their duties; establish equitable by-laws, rules and regulations for the distribution and use of water among the owners of said lands, and generally to perform all such acts as shall be necessary to fully carry out the purposes of this act. The said by-laws, rules and regulations must be printed in convenient form for distribution in the district. And it is hereby expressly provided that all waters distributed for irrigation purposes shall be apportioned ratably to each land owner upon the basis of the ratio which the last assessment of such owner for district purposes within said district bears to the whole sum assessed upon the district: *Provided*, That any land owner may assign the right to the whole or any portion of the waters so apportioned to him.

the lines of the irrigation district. The bill sets forth the various steps taken under the irrigation act for the purpose of forming the irrigation district, and it alleges the taking of

"SEC. 12. The board of directors shall hold a regular monthly meeting in their office on the first Tuesday in every month, and such special meetings as may be required for the proper transaction of business: *Provided,* That all special meetings must be ordered by a majority of the board. The order must be entered of record, and five days' notice thereof must, by the secretary, be given to each member not joining in the order. The order must specify the business to be transacted, and none other than that specified must be transacted at such special meeting. All meetings of the board must be public, and three members shall constitute a quorum for the transaction of business; but on all questions requiring a vote there shall be a concurrence of at least three members of said board. All records of the board shall be open to the inspection of any elector during business hours. The board and its agents and employés shall have the right to enter upon any land to make surveys, and may locate the necessary irrigation works and the line for any canal or canals, and the necessary branches for the same, on any lands which may be deemed best for such location. Said board shall also have the right to acquire, either by purchase or condemnation or other legal means, all lands and waters and water rights, and other property necessary for the construction, use, supply, maintenance, repair and improvements of said canal or canals and works, including canals and works constructed and being constructed by private owners, lands for reservoirs for the storage of needful waters, and all necessary appurtenances. In case of purchase, the bonds of the district hereinafter provided for may be used at their par value in payment; and in case of condemnation the board shall proceed, in the name of the district, under the provisions of title seven of part three of the Code of Civil Procedure. Said board may also construct the necessary dams, reservoirs and works for the collection of water for said district, and do any and every lawful act necessary to be done that sufficient water may be furnished to each land owner in said district for irrigation purposes. The use of all water required for the irrigation of the lands of any district formed under the provisions of this act, together with the rights of way for canals and ditches, sites for reservoirs, and all other property required in fully carrying out the provisions of this act, is hereby declared to be a public use, subject to the regulation and control of the State, in the manner prescribed by law."

(Sections 13 and 14 are not material.)

"SEC. 15. For the purpose of constructing necessary irrigating canals and works, and acquiring the necessary property and rights therefor, and otherwise carrying out the provisions of this act, the board of directors of any such district must, as soon after such district has been organized as may be practicable, and whenever thereafter the construction fund has

all steps necessary therefor, including the election of officers as provided in the act; that the board of directors submitted to the electors the question, whether a special assessment for

been exhausted by expenditures herein authorized therefrom, and the board deem it necessary or expedient to raise additional money for said purposes, estimate and determine the amount of money necessary to be raised, and shall immediately thereafter call a special election, at which shall be submitted to the electors of such district possessing the qualifications prescribed by this act, the question whether or not the bonds of said district in the amount as determined shall be issued. Notice of such election must be given by posting notices in three public places in each election precinct in said district for at least twenty days, and also by publication of such notice in some newspaper published in the county where the office of the board of directors of such district is required to be kept, once a week for at least three successive weeks. Such notices must specify the time of holding the election, the amount of bonds proposed to be issued; and said election must be held, and the result thereof determined and declared in all respects as nearly as practicable in conformity with the provisions of this act governing the election of officers: *Provided,* That no informalities in conducting such an election shall invalidate the same, if the election shall have been otherwise fairly conducted. At such election the ballots shall contain the words 'Bonds — Yes,' or 'Bonds — No,' or words equivalent thereto. If a majority of the votes cast are 'Bonds — Yes,' the board of directors shall cause bonds in said amount to be issued; if a majority of the votes cast at any bond election are 'Bonds — No,' the result of such election shall be so declared, and entered of record. And whenever thereafter said board in its judgment deems it for the best interests of the district that the question of issuance of bonds in said amount, or any amount, shall be submitted to said electors, it shall so declare of record in its minutes, and may thereupon submit such questions to said electors in the same manner and with like effect as at such previous election. . . ."

(The remainder of the section provides for the maturing and payment of the bonds, and is not material.)

(Section 16 is not material.)

"Sec. 17. Said bonds and the interest thereon shall be paid by revenue derived from an annual assessment upon the real property of the district; and all the real property in the district shall be and remain liable to be assessed for such payments, as hereinafter provided. . . ."

"Sec. 18. The assessor must, between the first Monday in March and the first Monday in June, in each year, assess all real property in the district to the persons who own, claim or have the possession or control thereof, at its full cash value. He must prepare an assessment book, with appropriate headings, in which must be listed all such property within the district, in which must be specified, in separate columns, under the appropriate head:

"*First.* — The name of the person to whom the property is assessed. If

$6000 should be made for the purpose of defraying the expenses of organization, and that the electors approved of such assessment and the proper proceedings were thereafter taken

---

the name is not known to the assessor, the property shall be assessed to ' unknown owners.'

" *Second.* — Land by township, range, section or fractional section, and when such land is not a Congressional division or subdivision, by metes and bounds, or other description sufficient to identify it, giving an estimate of the number of acres, locality and the improvements thereon.

" *Third.* — City and town lots, naming the city or town, and the number and block, according to the system of numbering in such city or town, and the improvements thereon.

" *Fourth.* — The cash value of real estate other than city or town lots.

" *Fifth.* — The cash value of improvements on such real estate.

" *Sixth.* — The cash value of city and town lots.

" *Seventh.* — The cash value of improvements on city and town lots.

" *Eighth.* — The cash value of improvements on real estate assessed to persons other than the owners of the real estate.

" *Ninth.* — The total value of all property assessed.

" *Tenth.* — The total value of all property after equalization by the board of directors.

" *Eleventh.* — Such other things as the board of directors may require.

" Any property which may have escaped the payment of any assessment for any year shall, in addition to the assessment for the then current year, be assessed for such year with the same effect and with the same penalties as are provided for such current year."

(Section 19 is not material.)

" SEC. 20. On or before the first Monday in August in each year, the assessor must complete his assessment book and deliver it to the secretary of the board, who must immediately give notice thereof, and of the time the board of directors, acting as a board of equalization, will meet to equalize assessments, by publication in a newspaper published in each of the counties comprising the district. The time fixed for the meeting shall not be less than twenty nor more than thirty days from the first publication of the notice, and in the meantime the assessment book must remain in the office of the secretary for the inspection of all persons interested.

" SEC. 21. Upon the day specified in the notice required by the preceding section for the meeting, the board of directors, which is hereby constituted a board of equalization for that purpose, shall meet and continue in session from day to day, as long as may be necessary, not to exceed ten days, exclusive of Sundays, to hear and determine such objections to the valuation and assessment as may come before them, and the board may change the valuation as may be just. The secretary of the board shall be present during its sessions and note all changes made in the valuation of property, and in the names of the persons whose property is assessed, and

by which to assess the property owners, and that plaintiff's, Mrs. Bradley's, assessment amounted to $51.31, which she refused to pay because the act was, as alleged, unconstitutional and void.

The bill further states that the collector then proceeded to enforce the collection by a sale of the land, and did sell it to the irrigation district, but that no deed has been given to the

---

within ten days after the close of the session he shall have the total values, as finally equalized by the board, extended into columns and added.

"Sec. 22. The board of directors shall then levy an assessment sufficient to raise the annual interest on the outstanding bonds, and at the expiration of ten years after the issuing of bonds of any issue must increase said assessment to an amount sufficient to raise a sum sufficient to pay the principal of the outstanding bonds as they mature. The secretary of the board must compute and enter in a separate column of the assessment book the respective sums, in dollars and cents, to be paid as an assessment on the property therein enumerated. When collected, the assessment shall be paid into the district treasury, and shall constitute a special fund, to be called the 'Bond Fund of —— Irrigation District.' In case of the neglect or refusal of the board of directors to cause such assessment and levy to be made as in this act provided, then the assessment of property made by the county assessor and the state board of equalization shall be adopted, and shall be the basis of assessments for the district, and the board of supervisors of the county in which the office of the board of directors is situated shall cause an assessment roll for said district to be prepared, and shall make the levy required by this act, in the same manner and with the like effect as if the same had been made by said board of directors, and all expenses incident thereto shall be borne by such district. In case of the neglect or refusal of the collector or treasurer of the district to perform the duties imposed by law, then the tax collector and treasurer of the county in which the office of the board of directors is situated must, respectively, perform such duties, and shall be accountable therefor upon their official bonds as in other cases.

"Sec. 23. The assessment upon real property is a lien against the property assessed from and after the first Monday in March for any year, and the lien for the bonds of any issue shall be a preferred lien to that for any subsequent issue, and such lien is not removed until the assessments are paid or the property sold for the payment thereof."

(Sections 24 to 30, inclusive, provide for collecting the assessments and for the sale of the lands of those not paying, the giving of deeds upon such sale, and for the redemption of the lands so sold and for the character of the deed as to its being *prima facie* evidence, and in some cases conclusive evidence of the regularity of the proceedings, and such sections and the remainder of the act are not material to the present inquiry.)

district by the collector, and an injunction is asked to restrain the execution and delivery of any deed by such collector, because of the alleged invalidity of the act under which the proceedings were taken.

The bill also alleged a proposed issue of bonds to the amount of $400,000, subject to the decision of the electors at an election proposed to be held under the provisions of the act.

Various reasons are set out in the bill upon which are based the allegation of the invalidity of the act, among which, it is stated, that the law violates the Federal Constitution in that it amounts to the taking of the plaintiff's property without due process of law. It is also stated that the act is in violation of the state constitution in many different particulars, which are therein set forth.

The bill also asks that the assessment may be set aside and all the proceedings declared void on the ground of the invalidity of the act itself.

The defendants demurred to the first bill of the complainant and the demurrer was overruled. The complainants were granted leave to serve a second amended bill to which the defendants put in an answer, denying many of the material allegations of the bill, and claiming the entire validity of the act.

The case came on for hearing before the Circuit Judge by consent, upon the second amended bill of complainants, and defendants' answer thereto, and the court gave judgment against the defendants because of the unconstitutionality of the irrigation act, it being, as held, in violation of the Federal Constitution, as the effect of such legislation by the State was to deprive complainants of their property without due process of law. The decision of the Circuit Judge was given for the reasons stated by him in his opinion rendered upon the argument of the demurrer to the bill of complainants, and some of the facts stated in the bill and admitted by the demurrer were denied in the answer subsequently served by the defendants. The sole ground of the decision was, however, the unconstitutionality of the act, as above stated. From

the judgment entered upon the decision of the Circuit Judge the irrigation district appealed directly to this court by virtue of the provisions of § 5, c. 517 of the Laws of 1891, 26 Stat. 826, which give an appeal from the Circuit Court direct to the Supreme Court "in any case that involves the construction or application of the Constitution of the United States"; and also "in any case in which the constitution or law of a State is claimed to be in contravention to the Constitution of the United States."

The case was argued in this court with *Tregea* v. *Modesto Irrigation District*, No. 13, *post*, 179.

*Mr. A. L. Rhodes* (*Mr. R. Percy Wright, Mr. John R. Aitken* and *Mr. Samuel F. Smith* were with him on his brief) for appellants. He cited *Atchinson &c. Railroad* v. *Wilson*, 33 Kansas, 223; *Baltimore & Potomac Railroad* v. *Fifth Baptist Church*, 137 U. S. 568; *Burnett* v. *Sacramento*, 12 California, 76; *Hamilton Bank* v. *Dudley*, 2 Pet. 492; *Central Irrigation District* v. *De Lappe*, 79 California, 351; *Crall* v. *Poso Irrigation District*, 87 California, 140; *Clement* v. *Everest*, 29 Michigan, 19; *Chambers County* v. *Clews*, 21 Wall. 317; *Cleveland* v. *Tripp*, 13 R. I. 50; *Kentucky Railroad Tax cases*, 115 U. S. 321; *Coster* v. *Tide Water Co.*, 3 C. E. Green, 54; *Daily* v. *Swope*, 47 Mississippi, 367; *Dayton Mining Co.* v. *Seawell*, 11 Nevada, 408; *Elmwood* v. *Marcy*, 92 U. S. 289; *Emery* v. *San Francisco Gas Co.*, 28 California, 345; *East Hartford* v. *Hartford Bridge Co.*, 10 How. 511; *Gut* v. *Minnesota*, 9 Wall. 35; *Hagar* v. *Reclamation District*, 111 U. S. 701; *Lux* v. *Haggin*, 69 California, 255; *Madera Irrigation District*, 92 California, 296; *Modesto Irrigation District* v. *Tregea*, 88 California, 334; *Mulligan* v. *Smith*, 59 California, 206; *Mobile County* v. *Kimball*, 102 U. S. 691; *McMillan* v. *Anderson*, 94 U. S. 37; *Oury* v. *Duffield*, 1 Arizona, 509; *Palmer* v. *McMahon*, 133 U. S. 660; *Pittsburgh* v. *Backus*, 154 U. S. 421; *People* v. *Turnbull*, 93 California, 630; *People* v. *Selma Irrigation District*, 98 California, 206; *People* v. *Hagar*, 52 California, 171; *Excelsior Planting Co.* v. *Tax Collector*, 39 La. Ann. 455; *People* v. *Brooklyn*, 4

N. Y. 419; *Quint* v. *Hoffman*, 103 California, 506; *Reclamation District* v. *Gray*, 95 California, 601; *Reclamation District* v. *Turner*, 104 California, 334; *Swamp Land District* v. *Silver*, 98 California, 53; *Stockton & Vigalia Railroad* v. *Stockton*, 41 California, 147; *Spaulding* v. *North San Francisco Homestead Ass'n*, 87 California, 40; *Spencer* v. *Merchant*, 125 U. S. 345; *Tregea* v. *Owens*, 94 California, 318; *Turlock Irrigation District* v. *Williams*, 76 California, 360; *Talbot* v. *Hudson*, 82 Mississippi, 422; *Tide Water Co.* v. *Coster*, 3 C. E. Green, 518; *Williams* v. *School District*, 33 Vermont, 271; *Williams* v. *Detroit*, 2 Michigan, 570; *Wurtz* v. *Hoagland*, 114 U. S. 606.

*Mr. Benjamin Harrison* for appellants.

*Mr. William D. Guthrie* and *Mr. Clarence A. Seward*, by leave of court, filed a brief on behalf of holders of bonds issued under the irrigation laws of California.

*Mr. George H. Maxwell* for appellees.

I. The broad question of the power of arid States to carry out a state policy of irrigation is not involved here, and this power will be unimpared, though the Wright Act be unconstitutional. Any State, by the exercise, within well-established constitutional limitations, of its power of general taxation for a public purpose, or of assessment for a local improvement upon lands benefited, may provide for the irrigation of its arid lands. *Regents* v. *Williams*, 9 G. & J. 365.

II. The Wright Act vested in self-constituted petitioners power to determine the expediency, fix the boundaries and thereby control the organization and operations of irrigation districts, and without a hearing to subject private property to burdens of assessment amounting to confiscation, giving to communities power to assess without limit, and without any regard to benefits, for an alleged public use, which is in fact private, the one class of property selected to bear these burdens. No law could so violate natural justice and constitutional rights;

and operate successfully. It is communism and confiscation under the guise of law. *McCulloch* v. *Maryland*, 4 Wheat. 316, 428; *Cullen* v. *Glendora Water Co.*, 39 Pac. Rep. 769.

III. Assessments for local public improvements are an exercise of the general power of taxation, but are controlled by principles and constitutional limitations different from those governing taxation for revenue for governmental purposes. The principle that private property shall not be taken for public use without just compensation, which limits the exercise of the power of eminent domain, likewise limits this power of assessment, because such assessments are levied in the exercise of the sovereign power of the people to provide for the general public welfare, and the only ground upon which their levy upon specific property instead of upon the whole public can be justified is that the property assessed is specially benefited, and thus receives compensation for the burdens imposed upon it. *Illinois Central Railroad* v. *Decatur*, 147 U. S. 190, 197; *McCulloch* v. *Maryland*, 4 Wheat. 316, 431; *State* v. *Newark*, 3 Dutcher, (27 N. J. Law,) 185; *Madera case*, 92 California, 296; *Tide Water Co.* v. *Coster*, 3 Green, (18 N. J. Eq.) 518; *Hammett* v. *Philadelphia*, 65 Penn. St. 146; *In re Washington Avenue*, 69 Penn. St. 352; *In re Morewood Avenue*, 159 Penn. St. 20; *Stuart* v. *Palmer*, 74 N. Y. 183; *Raleigh* v. *Peace*, 110 N. Car. 32; *Creighton* v. *Manson*, 27 California, 613; *White* v. *Saginaw*, 67 Michigan, 33; *Birmingham* v. *Klein*, 89 Alabama, 461; *Bridgeport* v. *N. York & N. Haven Railroad*, 36 Connecticut, 255; *Cheaney* v. *Hooser*, 9 B. Mon. 330.

IV. The power of assessment for local public improvements is based upon special benefits to the property assessed, and is limited to property benefited by the improvement, and the assessments must be apportioned according to benefits. Property not benefited by the improvement cannot be subjected to assessments for its construction, and assessments cannot be levied in excess of such benefits. These limitations are the law of the land, established by a long current of judicial decisions, resting upon fundamental principles of natural justice and constitutional government. Under the Wright Act the assessments are not based upon or apportioned according to

benefits. Property not benefited is assessed, and the burdens of assessment are perpetual and not limited to benefits. *Madera case, ubi sup.; In re Market St.*, 49 California, 546; *Sharp* v. *Speir*, 4 Hill, 76; *Macon* v. *Patty*, 57 Mississippi 378, and cases cited; *Stuart* v. *Palmer*, 74 N. Y. 183; *Canal Bank* v. *Albany*, 9 Wend. 244; *In re William and Anthony Streets*, 19 Wend. 678; *In re Flatbush Ave.*, 1 Barb. 286; *In re Morewood Avenue*, 159 Penn. St. 20; *Allegheny City* v. *Western Penn. Railroad*, 136 Penn. St. 375; *Pittsburgh's Petition*, 138 Penn. St. 401; *Hale* v. *Kenosha*, 29 Wisconsin, 599; *Johnson* v. *Milwaukee*, 40 Wisconsin, 315; *Tide Water Co.* v. *Coster, ubi sup.* and cases cited; *Kean* v. *Driggs Drainage Co.*, 16 Vroom, (45 N. J. Law,) 91; *Reynolds* v. *Paterson*, 19 Vroom, (48 N. J. Law,) 435; *State* v. *Kearney*, 55 N. J. Law, 463; *Norfolk* v. *Chamberlain*, 89 Virginia, 196; *Hanscom* v. *Omaha*, 11 Nebraska, 37; *State* v. *Ramsey County Court*, 33 Minnesota, 295; *People* v. *Brooklyn*, 23 Barb. 175; *Elwood* v. *Rochester*, 43 Hun, 102; *Clark* v. *Dunkirk*, 12 Hun, 181; *S. C.* 75 N. Y. 612.

V. Benefits to justify assessment must be special, direct, immediate and certain. Under the Wright Act, city and town property, covered with buildings, and permanently devoted to uses excluding the possibility of irrigation, and lands and property incapable of being irrigated, and all improvements on any real property, which are required to be separately assessed, are included in irrigation districts, and assessed for the construction of an irrigation system from which they cannot derive any benefit except such uncertain possibility of collateral, indirect and remote advantage as might result from the irrigation of other property in the neighborhood. Such remote and indirect benefit will not warrant an assessment on any land for a proposed public improvement. *Hanscom* v. *Omaha, People* v. *Brooklyn*, and *Clark* v. *Dunkirk, ubi sup.; In re Morewood Avenue*, 159 Penn. St. 20; *Friedenwald* v. *Baltimore*, 74 Maryland, 116; *State* v. *Newark*, 3 Dutcher, 185; *In re Fourth Avenue*, 3 Wend. 452; *Thomas* v. *Gain*, 35 Michigan, 155.

VI. The assessments levied under the Wright Act are an exercise of the power of assessment for local improvement, and

their constitutionality must be determined under the principles controlling this power of assessment, as distinguished from principles applicable only to general taxation or eminent domain, or the exercise of the police power or power to regulate a common use or provide for a common improvement among several owners. The decisions sustaining the Wright Act, and the cases cited and arguments advanced in its support, rest upon wrong premises and false reasoning, because they utterly confuse the principles governing these different branches of the exercise of the power of the State, and though conceding the Wright Act to be an exercise of the power of assessment, seek to maintain it under principles and authorities applicable only to general taxation or eminent domain or the police power. *Davidson* v. *New Orleans*, 96 U. S. 97; *Norfolk* v. *Chamberlain*, 89 Virginia, 196; *Hammett* v. *Philadelphia*, 65 Penn. St. 146; *Head* v. *Amoskeag M'f'g Co.*, 113 U. S. 9, 26; *Wurts* v. *Hoagland*, 114 U. S. 606, 614.

VII. The legislature in the exercise of its power of assessment for a local public improvement has power primarily to determine the necessity for the improvement, to determine what property will be benefited thereby, to designate the district within which the assessments are to be collected and to fix the mode of their apportionment; but this power is not without restriction, or in all cases conclusive and beyond judicial control. It is only where the legislature, or the subordinate body to whom its power may be delegated, has exercised its judgment in the determination of a question of fact relating to any of these matters, which has been committed to its discretion, that its action is conclusive, and even then it is not necessarily so if it has acted in an arbitrary, oppressive or fraudulent manner or has in any way acted in excess of its power. Whenever, as is the case of the Wright Act, it appears that a principle of law has been violated, as by the inclusion of lands clearly not benefited, or by the application of a wrong basis of apportionment, the legislative action will be held void by the courts, because in excess of its powers. *Spencer* v. *Merchant*, 125 U. S. 345; *People* v. *Brooklyn*, 23 Barb. 166; *Paulsen* v. *Portland*, 16 Oregon, 450; *Mason* v. *Spencer*, 35 Kansas,

512; *State* v. *Ramsey County*, 33 Minnesota, 295; *Merrill* v. *Humphrey*, 24 Michigan, 170; *Chicago* v. *Burtice*, 24 Illinois, 489; *Atlanta* v. *Gate City Street Railway*, 80 Georgia, 276; *Spring Valley Water Works* v. *San Francisco*, 82 California, 286; *Yick Wo* v. *Hopkins*, 118 U. S. 356; *Elwood* v. *Rochester*, 43 Hun, 102; *Hassen* v. *Rochester*, 65 N. Y. 516; *People* v. *Jefferson County*, 55 N. Y. 604; *Graham* v. *Conger*, 85 Kentucky, 582; *Thomas* v. *Gain*, 35 Michigan, 155; *Le Roy* v. *New York*, 20 Johns. 429; *In re Protestant Epis. School*, 75 N. Y. 324; *Masters* v. *Portland*, 24 Oregon, 161.

VIII. The Wright Act violates general principles of constitutional law, by which this court will unquestionably be guided in this case, as it is one of original federal jurisdiction; but these same principles are a part of the general law of the land, and when they are violated in the taking of private property it is taken without due process of law, and its owner is deprived of the equal protection of the law, and may claim the protection of the Federal Constitution, no matter whether the case be one of original federal jurisdiction or an appeal from a state court. *Sharpless* v. *Philadelphia*, 21 Penn. St. 147; *Murray* v. *Hoboken Land & Improvement Co.*, 18 How. 272; *Hurtado* v. *California*, 110 U. S. 516; *Railroad Tax cases*, 13 Fed. Rep. 722; *Davidson* v. *New Orleans*, 96 U. S. 97.

IX. A hearing is essential to due process of law; and whenever an assessment district is to be created by any subordinate legislative body, and assessments are to be levied on lands therein for the construction of a local public improvement, every landowner must have a hearing, at some stage of the proceedings, before the assessment becomes a final charge against his land, at which he may show that his lands are not or will not be benefited by the proposed improvement, or that the assessment against him is not in proportion to benefits or is in excess of benefits; and this hearing must be given as a matter of right, before a tribunal having power and whose duty it shall be to exclude the lands or relieve them from assessment if not benefited, or if the assessments are in excess of or not proportionate to benefits, then to readjust them or declare them invalid; and the landowner cannot be deprived

of this right to a hearing by any determination of the legislature fixing in advance an arbitrary basis of apportionment, with reference to unknown future conditions, as to which the legislature could have had no knowledge upon which to base the exercise of any judgment or discretion in reaching its determination, or by clothing the assessment district in the guise of a public corporation. *King's River Reclamation Dist.* v. *Phillips*, 39 Pac. Rep. 630, 41 Pac. Rep. 335; *Remsen* v. *Wheeler*, 105 N. Y. 573; *People* v. *Henion*, 64 Hun, 471; *Paulsen* v. *Portland*, 149 U. S. 30; *Stuart* v. *Palmer*, 74 N. Y. 183; *Dyar* v. *Farmington*, 70 Maine, 515; *Cypress Pond Draining Co.* v. *Hooper*, 2 Met. (Ky.) 350; *Howell* v. *Tacoma*, 3 Wash. 711.

X. It is contended in support of the Wright Act that the hearing before the supervisors, when they are to hear the petition for the formation of the district, affords to the landowner all the opportunity for a hearing to which he is entitled upon the question of benefits, and consequently that the act does not in this respect take property without due process of law. This cannot be so, for the reason that under the provisions of the act as construed by the Supreme Court of California it is practically impossible for any facts to be established at this hearing by any objecting landowner which would give him the right or which would make it the duty of the board, upon the ground that his lands were not benefited, or upon any ground whatsoever, to exclude any lands which had been included in the boundaries of the proposed district as fixed by the petitioners in the petition for its organization.

XI. The radical changes from the Wright Act, which have been made in the irrigation district laws of Nebraska, Idaho and Oregon, which were framed in the light of experience with the practical operations of the Wright Act, strongly support our argument that the unconstitutional features of the Wright Act make it impossible for any such law to operate successfully, and show that these later statutes have sought to eliminate those unconstitutional features of the Wright Act which have given rise to its most grievous oppressions, and

which will work the practical destruction of any law embodying such provisions.

XII. It is a settled principle of universal law, and is the law of the land in this nation, that the right to compensation whenever private property is taken for public use, is an incident to the exercise of that power, and inseparably connected with it. Any attempt of any legislature to levy assessments on property not compensated by special benefits or in excess of such benefits, or not proportionate to benefits, for the purpose of constructing a local public improvement for the general public welfare, is therefore an excess of legislative power, and clearly a violation of the Fourteenth Amendment.

*Mr. Joseph H. Choate* for appellees.

The constitution of California provides by Art. 1, § 1, that acquiring, possessing and protecting property are inalienable rights; and by § 14, that "Private property shall not be taken or damaged for public use without just compensation having been first made to, or paid into court for, the owner." Our main contention is that the Wright Act is in violation of the Fourteenth Amendment of the Constitution of the United States, which provides — "nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

We insist that it violates each of these clauses; and, also that, in its treatment of private property, it violates those uniform constitutional provisions for the protection of private property which are found alike in the constitution of California and those of all the other States.

I. Before coming to the special methods pursued in the Wright Act, we submit that any law of any State which sought to accomplish the objects of that act would be obnoxious to the constitutional provisions which we invoke, for that act plainly attempts to provide for the taking of private property for a private use.

In *Bank of Columbia* v. *Okely*, 4 Wheat. 235, the court say,

(p. 244,) " As to the words from Magna Charta incorporated into the constitution of Maryland — [No freeman ought to be . . . deprived of his . . . property but by the judgment of his peers or the law of the land] — after volumes spoken and written with a view to their exposition, the good sense of mankind has at length settled down to this: that they were intended to secure the individual from the arbitrary exercise of the powers of government unrestrained by the established principles of private rights and distributive justice."

Whoever, then, undertakes to take away my property must show the authority of law for doing so; not an arbitrary edict of the legislature, but a legitimate exercise of legislative power, as restrained by the established principles of private rights and distributive justice — a law of the land, which does not deny to me the equal protection of the laws.

And further, where money is sought to be taken by the State from an individual by the exercise of the power of taxation in any form, or however that power may be defined, it must be for the purpose of expenditure for a public object or use, and the test of the validity of a law enacted for that purpose must necessarily be the essential character of the direct object of the expenditure proposed. " The incidental advantage to the public, or to the State, which results from the promotion of private interests and the prosperity of private enterprises or business, does not justify their aid by the use of public money raised by taxation, or for which taxation may become necessary." *Lowell* v. *Boston*, 111 Mass. 461.

Examining the Wright Act by the light of these principles we find it to be an act to raise a fund by levy upon all the landholders of a given district, whether their lands need irrigating or not, and whether they desire to have them irrigated or not, to be expended in procuring water for the irrigation of all the lands in the district, so as to make it cheaper for those of them who do desire it than if they had to irrigate their own lands at their own individual expense.

The pecuniary relief of such of the landholders is thus the direct and immediate object of the intervention of the State

by the exercise of the power of taxation.    This object is as strictly private as it was in any of the famous cases which have condemned similar attempts to wrest money from citizens by force of law for private use, and the resulting benefits to the public are quite as indirect and uncertain as in any of those.

In *Lowell* v. *Boston,* 111 Mass. 454, an act to loan the credit of the city of Boston to individual sufferers by the great fire, to enable them to rebuild, each on his own property, was condemned.    In *Loan Association* v. *Topeka,* 20 Wall. 655, this court pronounced against an act of Kansas " to authorize cities and counties to issue bonds for the purpose of building bridges, aiding railroads, water power or other works of internal improvement."    In *State* v. *Osawkee,* 14 Kansas, 418, the Supreme Court of Kansas held an act of the legislature of that State authorizing the issue of township bonds to provide means for furnishing destitute citizens with food and with seed to be unconstitutional.    The Supreme Court of Maine holds the same doctrine.    *Allen* v. *Jay,* 60 Maine, 124.    See also *Waterloo Woolen Manufacturing Company* v. *Shanahan,* 128 N. Y. 345; *Shoemaker* v. *United States,* 147 U. S. 282; *In re Niagara Falls & Whirlpool Railroad,* 108 N. Y. 375; *In re Jacobs,* 98 N. Y. 98; *Concord Railroad* v. *Greely,* 17 N. H. 47.

As the present case is plainly governed by the principles laid down in these leading cases, so it is not only distinguishable, but is in its essential nature absolutely distinct from all the classes of cases where local improvements have been held to be for public use, or have been sustained as a just exercise of the police power, or on other special and peculiar grounds. It was in reliance upon those classes of cases that the learned Supreme Court of California maintained the constitutionality of the law, while the United States Circuit Judge, adhering to the cardinal rules already laid down, declared it to be against first principles, and in direct violation of the constitutional prohibition whose protection we invoke.

We do not dispute that the legislature may by taxation or assessment provide for a local public improvement for the

benefit of a portion of the State; nor do we question that the legislature might, in the lawful exercise of this power, provide for the irrigation of arid lands, unproductive without irrigation. The operations of the Wright Act are, however, not limited to such unproductive lands, but include all lands, no matter how fertile or productive; and we deny that the furnishing of a fertilizer for the already productive lands of individual proprietors to make them more productive is or can be, in any possible legal sense, a public improvement; and we deny that the nine-tenths of the people of the locality who are not landholders have or can have any interest in such business, or that they can receive any benefit therefrom other than such as is, upon every principle of law, reason and common sense, strictly indirect, incidental and consequential. This is in the very nature of things. See *Scuffletown Fence Company* v. *McAllister*, 12 Bush, 312; *Anderson* v. *Kerns Drainage Co.*, 14 Indiana, 199; *McQuillen* v. *Hatton*, 42 Ohio St. 202; *Reeves* v. *Wood County*, 8 Ohio St. 333; *In re Niagara Falls & Whirlpool Railroad*, 108 N. Y. 375.

Nor is the contention of the Supreme Court of California aided by calling the unique entity, brought into existence by this statute under the name of Irrigation District, a public corporation. If the essential thing sought to be accomplished is the taking of the property or money of one citizen for the private benefit of another, it matters not whether the agency created for the purpose be called a public or private corporation, or a commission.

A corporation armed with the power to tax for the purpose of converting private grazing or farm lands into vineyards or orchards, with or without the will of the owner, takes private property for purely private uses, by whatever name it may be called.

In *Beach* v. *Leahy*, 11 Kansas, at p. 31, Mr. Justice Brewer, speaking of school districts, lays down the principle that —
" The mere fact that these organizations are declared in the statute to be bodies corporate, has little weight. We look behind the name to the thing named. Its character, its rela-

tions and its functions determine its position, and not the mere title under which it passes."

The cases in which the organization of districts for local improvement and the forced contributions of landholders therein by taxation or assessment for the common benefit have been upheld, as a legitimate exercise of legislative power, all differ from this Wright Act in this — that in all those cases there was a common interest, a common necessity or a common benefit, the promotion of which was obviously the direct and immediate object of the proposed expenditure, while here such direct and immediate object is the fertilization by water, at the common expense, of the lands of those owners who desire their lands to be irrigated, the interest of each being absolutely distinct and independent.

The Reclamation District Act differs from the Wright Act in every particular in which we claim the latter to be unconstitutional.   In the Reclamation District Act there was no unlawful delegation of legislative power; the object of the act was a purpose in which every landholder had a common interest, and was for the permanent reclamation of lands otherwise not only useless, but a menace to the public health.   The Reclamation Act gave the supervisors discretion to act upon the hearing of the petition.   Then, too, only the land to be reclaimed was assessed, and that tax was proportionate to the whole expense and to the benefit received.   Moreover, the tax was only to be collected by suit, in which any defence going to the validity of the tax could, of course, be set up.   In all of these fundamentally important particulars, and others, did the Reclamation Act differ from the Wright Act.

It was said by the court in *Loan Association* v. *Topeka*, and has often been repeated, that, "in deciding whether in the given case the object for which the taxes are assessed falls upon the one side or the other of this line, they must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and proper use of the government, whether state or municipal;" and that "what-

ever lawfully pertains to this and is sanctioned by time and the acquiescence of the people may well be held to belong to the public use, and proper for the maintenance of good government."

Surely, it will not be pretended that this novel and utterly unique statute was sanctioned by previous use or acquiescence, or ever had a precedent in legislation, or that it approximates in any degree to the exercise of legislative power for a governmental purpose.

The drainage cases, represented by the case of *Wurts* v. *Hoagland*, 114 U. S. 606, well illustrate the force of Mr. Justice Miller's rule just quoted, and are in striking contrast to the case at bar.

The sound and well-reasoned conclusion there, drawn from the early New Jersey cases, is, that "the drainage of large tracts of swamp and low lands upon proceedings instituted by some of the proprietors of the lands, to compel all to contribute to the expense of their drainage, have been maintained by the courts of New Jersey (without reference to the power of taking private property for public use under the right of eminent domain, or to the power of suppressing a nuisance dangerous to the public health), as a just and constitutional exercise of the power of the legislature to establish regulations by which adjoining lands, held by various owners in severalty, and in the improvement of which all have a common interest, but which by reason of the peculiar natural condition of the whole tract, cannot be improved or enjoyed by any of them without the concurrence of all, may be reclaimed and made useful to all at their joint expense."

Certainly, the proprietors of adjoining lands, already arable and devoted to the raising of wheat or other grain, or in use for grazing, which they are content and desire to continue to cultivate or use in that way, cannot be brought into the category here instanced by an application of some of their neighbors to compel them to have their lands irrigated in common with the petitioners.

But the court in *Wurts* v. *Hoagland* immediately follows up this statement of the rule applicable to drainage cases by

the further statement that " the case comes within the principle upon which this court upheld the validity of general mill acts in *Head* v. *Amoskeag M'f'g Co.*, 113 U. S. 9."

In that interesting case the court declined to decide or to consider the question whether the erection and maintenance of mills for manufacturing purposes under a general mill act could be upheld as a taking of private property for public use in the constitutional sense, but, after a careful review of the Massachusetts and New Hampshire cases from the beginning, rested the decision on the following proposition: " Upon principle and authority, therefore, independently of any weight due to the opinions of the courts of New Hampshire and other States, maintaining the validity of general mill acts as taking private property for public use in the strict constitutional meaning of that phrase, the statute under which the Amoskeag Manufacturing Company has flowed the land in question is clearly valid as a just and reasonable exercise of the power of the legislature, having regard to the public good in a more general sense, as well as to the rights of the riparian proprietors, to regulate the use of the water power of running streams, which, without some such legislation, could not be beneficially used."

No suggestion, therefore, can be found in the drainage or the mill acts, as interpreted by this court, which will countenance these irrigation acts as the legitimate exercise of legislative power for public or governmental purposes.

The government exercises and grants eminent domain with considerable liberality wherever the public purpose is sufficient to demand it. The most important consideration in the case of eminent domain is the necessity of accomplishing some public good which is otherwise impracticable. The power is much more like to that of the public police than that of taxation; it goes but a step further, and that in the same direction.

It is this principle upon which the mill acts are based, *Murdock* v. *Stickney*, 8 Cush. 113, and it is analogous to the common law way of necessity. It has nothing to do with public use in the sense that applies to taxation. It rests on

the nature of the property and the fact that there must of necessity be a kind of joint use.

In certain cases, therefore, of arid tracts of land needing only water to render it fruitful, such a power might, perhaps, be invoked by the owners for easements for canals or aqueducts, in order to obtain that water.  In such a case a full price is paid by the irrigator for whatever he takes, and no one is deprived of property without an equivalent.  But to tax all landowners whether their land is arid or not, whether they will or not, in a district the bounds of which were determined by irresponsible petitioners, is, we submit, a very different matter.  In such a case many a landowner may be and is deprived of his property — either in money or land — with no possible remuneration.  Under the power of eminent domain he is made to exchange his land for other property, its exact legal equivalent.  Under the Wright Act he is made invariably to give it up, because he can in such case, by no possibility, get any legal equivalent; for when his land is gone he can have no irrigation.  It is, therefore, the veriest sophistry to seek to uphold this act upon the principles which apply to eminent domain.

The immemorial and universally recognized right of every man to occupy and use his own land for such purposes as he sees fit, provided only that the land itself, or the condition in which he puts it, or the use which he makes of it, does not injure his neighbor, in which indeed the essential right of private property consists, cannot be invaded by his neighbor or by the State for the private benefit of his neighbor, for that is the very thing in which the taking of his property without due process of law consists.

The act here in question really proposes to furnish water as a commodity to the several landholders in the district for use upon their lands, as they may prefer, and cannot be distinguished in principle from an act which should provide for furnishing to the farmers of a district, for use or for sale, guano or other like fertilizers, or trees for planting, with an ultimate view to the promotion of the general prosperity of the neighborhood.  Nor can it be distinguished in principle

from an act providing for the erection of farm houses, or farm barns, or fences throughout a district by a forced levy on the landholders under the authority of the State in order to promote the growth of the neighborhood.   See *Gaines* v. *Buford*, 1 Dana, 481.

Finally, in dealing in the water as merchandise, the statute here in question bears the distinct form of a statute for private, as distinguished from public, use.

Any landowner — and landowners only — can have it, to use or to sell, but, of course, they cannot be compelled to take or to use it.

In *Jones* v. *Water Commissioners of Detroit*, 34 Michigan, 273, where a tax was levied upon vacant lots for the purpose of raising money to pay for water bonds, the court, in holding the tax invalid, said: "No one can be compelled to take water unless he chooses, . . . and citizens may take it or not as the price does or does not suit them."

But in the Wright Act the citizen is compelled to pay for the water whether he wants it or not.   He is to be taxed in proportion to the amount of water which he might have if he chose to use it.   So that the benefit does not accrue to the land by the construction of the improvement, but by the use of the improvement which the owner cannot be compelled to make.   But in all drainage, reclamation, levee and protection statutes the benefit does accrue to the landowner by the mere making of the improvement.   He cannot help being benefited. The same benefit accrues to the public.

We submit, therefore, that the Wright Act does violate the fundamental principles on which the right to the ownership and use of private property rests, takes from the citizen money to expend for the private use of his neighbors, does this without due process of law, and that it exceeds the legitimate authority of the legislature to accomplish the end sought by it, in any form or by any methods.

But, assuming for the sake of the argument, that the legislature itself might, without exceeding its constitutional powers, map out a district of the State, which did not require irrigation, and enact that it should, nevertheless, be irrigated

at the common expense of the landowners, so as to make it more productive, for their common benefit, and to promote the settlement and prosperity of that section of the State, we submit that it cannot abdicate its own responsibility and reach that result by the means and in the method provided by the Wright Act. That act will be found to involve a delegation by the legislature of the sovereign power of government to private citizens, which is quite as fatal to the act under the constitutional prohibitions, whose aid we invoke, as any other attempt to exceed the constitutional bounds of legislative power.

This brings into view the unique and, as we believe, wholly unprecedented features of the scheme contrived by this act for the oppression of the farmers of California. We think that the statute books of all States and nations outside of California, prior to 1887, will be searched in vain, without finding another such example, and especially in view of the construction which has been given to certain details of this statute by the Supreme Court of California.

The all-important question of the expediency of forming an irrigation district is determined, not by the legislature, nor by any public body or officer, but by the self-constituted body of petitioners, subject only to a vote of the qualified electors of the proposed district, who may or may not have any interest in the lands or the subject-matter, and nine-tenths of whom, as a matter of course, will have no interest. Practically, the vital question of the boundaries of the district is determined in the same way; for the functions of the supervisors in the matter of boundaries are really perfunctory.

As to the petitioners, they must be fifty, or a majority of the landholders of the district proposed by themselves. Thus, according to the construction of the act contended for by its advocates, two landholders, each owning a city lot, may be a majority vested with this power over one proprietor owning ten square miles; or fifty tenants in common of a town lot may institute the proceedings and exercise the vast power involved over five thousand proprietors of vast tracts of land who may have no desire or need for irrigation; for a majority

is only required in the event of there being a less number of proprietors within the district than one hundred, and, if there be five thousand proprietors, a minority consisting of no more than fifty may proceed by petition.

II. The supervisors have no power to determine whether there shall be an irrigation district or not. They cannot reject the petition, but must proceed to establish and define the boundaries, and, although a nominal power is given them to make such changes in the proposed boundaries as they may find to be proper, the proviso substantially nullifies this apparent power, for the proviso declares that they shall not modify the boundaries so as to except from the operation of this act any territory within the boundaries of the district proposed by the petitioners, which is susceptible of irrigation by the same system of works applicable to other lands in such proposed district.

In the *Modesto case*, 88 California, 334, 353, the Supreme Court, referring to the clause, "Nor shall any land which will not, in the judgment of the said board, be benefited by irrigation by said system be included within such district," held as follows: "We construe the law to mean that the board may include in the boundaries of the district all lands which in their natural state would be benefited by irrigation and are susceptible of irrigation by one system, regardless of the fact that buildings or other structures may have been erected here and there upon small lots which are thereby rendered unfit for cultivation, at the same time that their value for other purposes may have been greatly enhanced. *So construed*, we can see no objections to the law upon constitutional grounds or grounds of expediency. As to owners of such property, it seems reasonable to assume that they must participate indirectly at least in any benefits the district may derive from the successful inauguration of a system of irrigation; but aside from this the law contains an express provision designed to secure to them a benefit exactly corresponding to any burden to which they may be subjected in that . . . every taxpayer receives a portion of all the water distributed exactly equivalent to his proportion of the total tax levied,

and this water is his to use or to sell as he may elect, so that if his lot is not fit for cultivation he nevertheless gets a full equivalent for the tax assessed to him." The distinction between the words "susceptible of irrigation" in the first portion of the clause and the words " benefited by irrigation by said system," as thus construed, will not be overlooked. It is clear, therefore, that the board of supervisors not only has no power to pass upon the question of the expediency of forming the district, but has no practical power to prescribe its boundaries.

Before considering the legal question involved, the court should consider the practical working of this scheme of irrigation. The scheme may in some cases result in an abundant supply of water. In all cases it will result in an abundant supply of bonds, assessments, liens and sales for non-payment. The provision is for the creation of a nondescript quasi or semi-quasi public corporation for the purpose of managing the irrigation of private property. The board of directors of this corporation may not and probably will not include a single landholder.

Patronage, plunder and bonds without limit are the obvious tendency and result, if not the direct object of the act. Towns and villages, however solidly built, may be included, and practically are included in the districts proposed. The Supreme Court of California has made this remark in regard to districts formed under the Wright Act: " We can imagine the formation of an irrigation district under that statute with its boundaries confined to the limits of an incorporated city, or to those of a Swamp Land District where irrigation would be productive of injury and of no benefit." *Woodward* v. *Fruitvale Sanitary Dist.*, 99 California, 554. In a still later case it said : " The few checks provided by the statute against the reckless or improvident creation of bond liens . . . on all the lands in one of these irrigation districts, largely by the votes of electors who own no part of such lands, should be strictly enforced in favor of the owners of such lands." *Cullen* v. *Glendora Co.*, 39 Pac. Rep. 769.

We submit, with all confidence, that this novel mode of

constituting districts for assessment is an unlawful delegation of legislative power, and is in its very nature one of those exercises of the powers of government, unrestrained by the established principles of private rights and of distributive justice, which this court has declared to be the thing which constitutes the taking of a man's property without due process of law.

The authorities for the proposition upon which we now rely are quite numerous and very emphatic. The leading case, by reason of the ability and high character of the court from which it emanates, is *People* v. *Bennett*, 29 Michigan, 451. The Supreme Court of Michigan there laid it down as a generally recognized principle never to be lost sight of, that, while the law may extend great facilities to persons and communities desirous of becoming incorporated, "yet a compulsory incorporation can only come from direct legislative action, or the action of such persons or bodies as may by the law of the land be vested with sufficient delegated authority to bind the community;" and further held that while it is manifest that one of the first and most vital questions involved in a public corporation is that of boundaries, and while of course it would be natural and for the interest of a compact body of inhabitants to be converted into a village for purposes of government, yet " it would be tyrannical to allow them to determine for themselves what property should be made tributary to their local interests; in which the rest of the town has no concern. . . . But it is not in the power of a legislature to abdicate its functions, or to subject citizens and their interests to the interference of any but lawful public agencies. The judicial power must be vested in courts. Such legislative and local authority as can be delegated at all, must be delegated to municipal corporations or local boards and officers. The definition of corporate bounds is second in importance to no corporate interests whatever. If it can be delegated at all so as to include any but single settlements, it must be delegated to somebody recognized by the constitution as capable of receiving such authority and having local jurisdiction over the territory to be incorporated. It is impossible to sustain a dele-

gation of any sovereign power of government to private citizens or to justify their assumption of it."

The conclusion is inevitable from an examination of the authorities, that a delegation by the legislature of its power to lay out districts for public improvement to the irresponsible petitioners and to the majority of the electors in the district designated by the petitioners, is manifestly illegal and unconstitutional. *Board of Com'rs of Wyandotte County* v. *Abbott*, 52 Kansas, 148; *Parks* v. *Board of Com'rs of Wyandotte County*, 61 Fed. Rep. 436; *McCabe* v. *Carpenter*, 102 California, 469; *People* v. *Parks*, 58 California, 624; *Ex parte Wall*, 48 California, 279. The Wright Act finds no support in any of the cases which have sustained the laying out of improvement districts of any kind by the State, or by municipal or other authorities representing the State and exercising governmental power on behalf of the State, as a proper method of taxing or taking property for public use.

III. Assuming again, for the sake of the argument, that the Wright Act, so far as it provides for the organization of irrigation districts by means of a petition of fifty or a majority of the landholders of the district proposed in the petition, approved by a vote of the majority of the electors of the district, is a legitimate exercise of legislative power so as to constitute to that extent due process of law for the taking of private property by taxation, we submit that there is a further fatal defect in the act, in that it permits the whole cost to be levied by the board of directors of the district upon all of the real estate of the district according to value, with no reference to the degree of benefit conferred, all of which is done without due process of law and without compensation to the owner, and herein it violates the constitutional provisions whose aid we invoke.

Here again the legislature does not decide or declare that in the irrigation of a particular district described by it, or to be described by a municipal or other public authority properly representing it, the assessment shall be according to the value as in its judgment the nearest approximation to benefit; but it decides and declares that in any district that may be described

by petitioners and created by qualified electors the assessment according to value shall prevail.   We submit that this method of taxation is purely arbitrary and capricious, contrary to the fundamental principles of taxation, and that it deprives the statute of the character of due process.

In his opinion in the *Madera case,* 92 California, 324, Mr. Justice Harrison says: "All taxation has its source in the necessities of organized society, and is limited by such necessity, and can be exercised only by some demand for the public use or welfare.   And whether the tax be by direct imposition for revenue, or by assessment for a local improvement, it is based upon the theory that it is in return for the benefit received by the person who pays the tax, or by the property which is assessed.   For the purpose of apportioning this benefit, the legislature may determine in advance what property will be benefited, by designating the district within which it is to be collected, as well as the property upon which it is to be imposed, or it may appoint a commission or delegate to a subordinate agency the power to ascertain the extent of this benefit."

Under the Wright Act neither the legislature nor any subordinate or local legislative body determines what property will be benefited, either "by designating the district" or by designating "the property upon which" the assessment "is to be imposed."   As we have shown, this power of designation and determination is practically vested in the petitioners. They may include any lands susceptible of irrigation, or which, under the construction given to the statute by the Supreme Court of California in the *Modesto case,* would be even indirectly benefited thereby, by the increased productiveness of adjoining property, or which were, in their natural state, susceptible of irrigation.

Mr. Justice Harrison further says in his opinion in the *Madera case:* "It is not necessary to show that property within the district may be actually benefited by the local improvement, and, even if it positively appear that no benefit is received, such property is not thereby exempted from bearing its portion of the assessment, nor is the act unconsti-

tutional because it provides that such property shall be assessed."

We submit that this statement of the law is simply revolutionary of all established principles, precedents and cases upon this subject, and that the true principle is directly to the contrary. As was said by Chief Justice Shaw, in *Wright* v. *Boston*, 9 Cush. 233, the principle is that : " When certain persons are so placed as to have a common interest amongst themselves, but in common with the rest of the community, laws may be justly made, providing that, under suitable and equitable regulations, those common interests shall be so managed that those who enjoy the benefits shall equally bear the burden."

See also *Tide Water Co.* v. *Coster*, 18 N. J. Eq. 518; *Stuart* v. *Palmer*, 74 N. Y. 183; *Montana Co.* v. *St. Louis Mining Co.*, 152 U. S. 160, 169; *Brandenstein* v. *Hoke*, 101 California, 131; *Macon* v. *Patty*, 57 Mississippi, 378; *People* v. *Brooklyn*, 4 N. Y. 419; *Hammett* v. *Philadelphia*, 65 Penn. St. 146; *In re Washington Avenue*, 69 Penn. St. 352.

The concluding sentence in the last case is entirely apposite. " There is a clear implication from the primary declaration of the inherent and indefeasible right of property, followed by the clauses guarding it against specific transgressions " [referring to the usual constitutional limitations] " that covers it with an ægis of protection against all unjust, unreasonable and palpably unequal exactions under any name or pretext. Nor is this sanctity incompatible with the taxing power or that of eminent domain, where for the good of the whole people, burdens may be imposed or property taken. I admit that the power to tax is unbounded by any express limit in the constitution — that it may be exercised to the full extent of the public exigency. I concede that it differs from the power of eminent domain, and has no thought of compensation by way of a return for that which it takes and applies to the public good, further than all derive benefit from the purpose to which it is applied. But, nevertheless, taxation is bounded in its exercise by its own nature, essential characteristics and purpose. It must therefore visit all alike in a reasonably

practical way, of which the legislature may judge, but within the just limits of what is taxation. Like the rain, it may fall upon the people in districts and by turns, but still it must be public in its purpose, and reasonably just and equal in its distribution, and cannot sacrifice individual right by a palpably unjust exaction. To do so is confiscation, not taxation; extortion, not assessment, and falls within the clearly implied restriction in the Bill of Rights."

Later Pennsylvania cases still more forcibly affirm this doctrine. *Allegheny City* v. *Western Penn. R.,* 138 Penn. St. 375; *Pittsburgh's Petition,* 138 Penn. St. 401; *Morewood Avenue,* 159 Penn. St. 20; *Park Ave. Sewers,* 169 Penn. St. 433. See also *State* v. *Newark,* 37 N. J. Law, 415; *Stuart* v. *Palmer,* 74 N. Y. 183; *Thomas* v. *Gain,* 35 Michigan, 155; *People* v. *Jefferson County Court,* 55 N. Y. 604; *Cypress Pond Draining Co.* v. *Hooper,* 2 Met. (Ky.) 350; *Davidson* v. *New Orleans,* 96 U. S. 97; *Hagar* v. *Reclamation District,* 111 U. S. 701.

IV. Assuming again, for the sake of the argument, that the statute in question is a valid exercise of legislative power in respect to the formation of the district by the means and through the agencies provided, and that the mode of assessment can be regarded as due process of law, we claim that the total want of an opportunity to be heard on the question of the expediency of forming the district, on the question of boundaries, on the questions of cost and scheme of improvement, and on the question of benefit received, deprives the act of the constitutional character of due process of law as it has been heretofore defined by this court.

The only hearing accorded to the landholder, from the beginning to the end of the scheme, from the time of the filing of the petition until his land is sold out for non-payment of assessment, is the very scanty right of being heard upon the question of the valuation of his own property, and perhaps of other property, included in the district. That is accorded to him apparently as an idle form; for even in respect to that limited point, if he cannot be heard on the question of benefit received, the hearing is utterly nugatory.

The principle has been thus stated by the Supreme Court of California: "It is a principle which underlies all forms of government by law that a citizen shall not be deprived of life, liberty, or property, without due process of law. The legislature has no power to take away a man's property, nor can it authorize its agents to do so, without first providing for personal notice to be given to him and for a full opportunity of time, place and tribunal to be heard in defence of his rights. This constitutional guarantee is not confined to judicial proceedings, but extends to every case in which a citizen may be deprived of life, liberty or property, whether the proceeding be judicial, administrative or executive in its nature." *Mulligan* v. *Smith*, 59 California, 230.

(*a*) In regard to the fundamental question as to whether there shall be an irrigation district, there is no hearing because the supervisors to whom the petition is to be presented have no power to consider or determine that question.

It is idle, we submit, to say as the Supreme Court of California does, that in this respect the grievance of the landholder is the same as is suffered by everybody within the limits of a municipal or school district whose organization and boundaries are to be determined by a popular vote of the residents of the proposed district. There is no resemblance whatever between the cases.

(*b*) There is no hearing, as matter of right, accorded to the landholder upon the question of boundaries. He may get notice, it is true, if he happens to take the local paper, that the petition is to be presented, but there is no right given him to present objections, and no duty imposed upon the supervisors to hear his objections.

The right to be heard in tax cases is a constitutional one and indefeasible, and applies to these special assessments for local improvements. *County of Santa Clara* v. *Southern Pacific Railway*, 18 Fed. Rep. 385; *Scott* v. *Toledo*, 36 Fed. Rep. 385; *Meyers* v. *Shields*, 61 Fed. Rep. 713; *Ulman* v. *Baltimore*, 72 Maryland, 587; *Railroad Tax cases*, 13 Fed. Rep. 722; *Stuart* v. *Palmer*, 74 N. Y. 183.

(*c*) As to the scheme of irrigation and its practicability and cost there is no pretence that these landholders who are to pay are to be consulted or to have a hearing in any respect whatever.

The audacious claim is made on the part of the upholders of the system that the mere right of being heard each on the value of his own land, without more, and without any right to be heard on the total cost or the proportional burden which he is to bear, or the benefit which he is to receive, is sufficient to uphold the act.

In answer to this objection, or rather in answer to the more limited objection that the act makes no provision for a hearing to be granted to the owners of the land prior to the organization of the district, it is claimed by Mr. Justice Harrison, in his opinion in the *Madera case*, 92 California, 323, that the proceeding up to that point is merely for the creation of a public corporation, which is to be invested with certain political duties which it is to exercise in behalf of the State. He claims that it has never been held that the inhabitants of a district are entitled to notice and hearing upon a proposition to submit such a question to a popular vote; that it would be competent for the legislature to enact it without such a submission; and that it has as much power to create the district in accordance with the will of a majority of the electors.

We care not by what name the legal entity created by the act may be called, whether a public or a quasi or a semi-quasi, or, as it has been called by one learned judge, a bastard public-private corporation, but we do deny most emphatically that the function with which it is invested, the duties which it is to discharge are in any manner political duties to be exercised in behalf of the State.

It is nothing more or less than a service to be rendered to the landowners of the district for their own account without any intervention or interest of the public. It is for these landowners that the directors are to procure and furnish the water for use or for sale. It is for them and at their expense that they are to issue the bonds. It is for them that the directors are to mortgage the property acquired and to con-

stitute the plant of irrigation works.   There is nothing public
about it; and if there is any force in the points we have
already presented, there is no force in this contention of that
learned judge.

We do not think that, within any of the cases that have
been adjudicated by this court, the landholders can be denied
a hearing on all these important matters, and must put up
with the idle and almost formal hearing of the question of the
valuation of each landowner's individual piece of property.
The spirit of the constitutional rule is that they shall have
real bread in the matter of a hearing, and this would put them
off with nothing but a stone.   We invoke the decisions of this
court already made in support of the proposition that there
must be an actual hearing on the real merits, and not a mere
formal one on a strictly side issue, in order to give to the pro-
ceedings the character of due process of law.   *Kennard* v. *Mor-
gan*, 92 U. S. 480; *McMillen* v. *Anderson*, 95 U. S. 37; *Hagar*
v. *Reclamation District*, 111 U. S. 701; *Wurts* v. *Hoagland*,
114 U. S. 606; *Cincinnati, New Orleans & Texas Railroad* v.
*Kentucky*, 115 U. S. 321; *Walston* v. *Nevin*, 128 U. S. 578;
*Lent* v. *Tillson*, 140 U. S. 316; *Spencer* v. *Merchant*, 125 U. S.
345.

In the latter case this rule is laid down : " If the Legislature
provides for notice to and hearing of each proprietor at some
stage of the proceedings upon the question of what proportion
of the tax shall be assessed upon his land, there is no taking of
his property without due process of law."

Even an act imposing a tax and declaring what lands should
be deemed to be benefited, recognized the right of the land-
holders to be heard upon the validity of the assessment, and its
apportionment among the different parcels of the class which
the legislature had conclusively determined to be benefited.

We think that no case can be found supporting a statute
which deprives citizens of their property with no other right
to be heard than upon the question of value of their own
property, which is arbitrarily made the basis of assessment
without any regard to actual benefit received, against the
objection that such a statute is not due process of law.

(*d*) The claim that the Confirmation Act, approved March 16, 1889, is a cure for the objection of want of notice and hearing is properly disposed of by the suggestion of Ross, C. J., in the *Fallbrook case,* that it gives no right of hearing to the landholder, but is merely a proceeding to be taken, not by the landholder, but by the directors at their option.

*Mr. John F. Dillon,* (*Mr. Harry Hubbard* and *Mr. John M. Dillon* were on his brief,) for appellants. He cited, *Turlock Irrigation District* v. *Williams,* 76 California, 360; *Central Irrigation District* v. *De Lappe,* 79 California, 351; *Crall* v. *Poso Irrigation District,* 87 California, 140; *Modesto Irrigation District* v. *Tregea,* 88 California, 334; *In re Madera Irrigation District,* 92 California, 296; *Tregea* v. *Owens,* 94 California, 317; *People* v. *Selma Irrigation District,* 98 California, 206; *Rialto Irrigation District* v. *Brandon,* 103 California, 384; *Quint* v. *Hoffman,* 103 California, 506; *Woodruff* v. *Perry,* 103 California, 611; *Fallbrook Irrigation District* v. *Abila,* 106 California, 355; *Cullen* v. *Glendora Water Co.,* 39 Pac. Rep. 769; *Page* v. *Board of Supervisors of Los Angeles County,* 85 California, 50; *People* v. *Hagar,* 52 California, 171; *Shelby* v. *Guy,* 11 Wheat. 361; *Jackson* v. *Chew,* 12 Wheat. 153; *Green* v. *Neal,* 6 Pet. 291; *Roberts* v. *Lewis,* 153 U. S. 367; *Nesmith* v. *Sheldon,* 7 How. 812; *Van Rensselaer* v. *Kearney,* 11 How. 297; *Webster* v. *Cooper,* 14 How. 488; *Leffingwell* v. *Warren,* 2 Black, 599; *Detroit* v. *Osborne,* 135 U. S. 492; *Hagar* v. *Reclamation District,* 111 U. S. 701; *Missouri* v. *Lewis,* 101 U. S. 22; *Chicago Union Bank* v. *Kansas City Bank,* 136 U. S. 223; *Grand Trunk Railway* v. *Ives,* 144 U. S. 408; *Bauserman* v. *Blunt,* 147 U. S. 647; *May* v. *Tenney,* 148 U. S. 60.

MR. JUSTICE PECKHAM, after stating the case, delivered the opinion of the court.

The decision of this case involves the validity of the irrigation act enacted by the legislature of the State of California and set forth in the above statement of facts. The principal

act, passed in 1887, has been amended once or twice by subsequent legislation, but in its main features it remains as first enacted. The title of the act indicates its purpose. It is admitted by all that very large tracts of land in California are in fact "arid lands," which require artificial irrigation in order to produce anything of value. There are different degrees, however, in which irrigation is necessary, from a point where, without its use, the land is absolutely uncultivable, to where, if not irrigated artificially, it may yet produce some return for the labor of the husbandman in the shape of a puny and unreliable crop, but nothing like what it could and would do if water were used upon it. There are again other lands which, if not irrigated, will still produce the ordinary cereal crops to a more or less uncertain extent, but which, if water be used artificially upon them at appropriate times, are thereby fitted to and will produce much more certain and larger crops than without it, and will be also rendered capable of producing fruit and grapes of all kinds, of first-rate quality and in very large quantities. What is termed the "arid" belt is said in the Census Bulletin, No. 23, for the census of 1890, to extend from Colorado to the Pacific Ocean, and to include over 600,000,000 acres of land.

Of this enormous total, artificial irrigation has thus far been used only upon about three and a half million acres, of which slightly over a million acres lie in the State of California. It was stated by counsel that something over thirty irrigation districts had been organized in California under the act in question, and that a total bonded indebtedness of more than $16,000,000 had been authorized by the various districts under the provisions of the act, and that more than $8,000,000 of the bonds had been sold and the money used for the acquisition of property and water rights and for the construction of works necessary for the irrigation of the lands contained in the various districts.

Whether these statements are perfectly accurate or not is a matter of no great importance, as it has been assumed by all that numbers of districts have been formed under the act and a very large indebtedness already incurred, and that more

will be necessary before all the districts will be placed in an efficient working condition.    All these moneys, if the act be valid, must eventually be repaid from assessments levied upon the lands embraced within the respective districts, while the annually recurring interest upon these moneys is also to be paid in the same way.    Taking the California act as a model, it was also stated and not contradicted that several of the other States which contain portions of the arid belt (seven or eight of them) had passed irrigation acts, and that proceedings under. them were generally awaiting the result of this litigation.    The future prosperity of these States, it was claimed, depended upon the validity of this act as furnishing the only means practicable for obtaining artificial irrigation, without the aid of which millions and millions of acres would be condemned to lie idle and worthless, which otherwise would furnish enormous quantities of agricultural products and increase the material wealth and prosperity of that whole section of country.    On the other hand, it has been asserted, with equal earnestness, that the whole scheme of the act will, if carried out to the end, result in the practical confiscation of lands like those belonging to the appellees herein for the benefit of those owning different kinds of land upon which the assessments for the water would be comparatively light, and the benefits resulting from its use far in excess of those otherwise situated.    Such results, it is said, are nothing more than taking by legislation the property of one person or class of persons and giving it to another, which is an arbitrary act of pure spoliation, from which the citizen is protected, if not by any state constitution at least by the Federal instrument, under which we live and the provisions of which we are all bound to obey.

These matters are only alluded to for the purpose of showing the really great practical importance of the question before the court to the people of California, and of those other States where similar statutes have been passed.    Important not alone to the public, but also and specially important to those landowners whose lands are not only to be irrigated but are also to be assessed for the payment of the cost of the construction of the works necessary for supplying the water.

This court fully appreciates the importance of the question, and its decision has been reached after due reflection upon the subject and after a careful examination of the authorities bearing upon it.

The form in which the question comes before the court in this case is by appeal from a decree of the United States Circuit Court for the Southern District of California, perpetually enjoining the collector of the irrigation district from executing a deed conveying the land of the plaintiff, Maria King Bradley, under a sale made of such land pursuant to the provisions of the act under consideration. The grounds upon which relief was sought were that the act was in violation of the Federal Constitution and also of the constitution of the State of California. The decree is based upon the sole ground that the act violates the Federal Constitution in that it in substance authorizes the taking of the land of the appellee "without due process of law." Coming before the court in this way, we are not confined in our review of the decision of the lower court within the same limits that we would be if the case were here on error from the judgment of a state court.

The jurisdiction of the United States Circuit Court in this case was based upon the fact that the plaintiffs were aliens and subjects of Great Britain, and that court therefore had the same jurisdiction as a state court would have had to try the whole question and to examine and decide not only as to its conformity with the Federal Constitution, but in addition whether the act were a violation of the state constitution, and whether the provisions of the act itself had been complied with. In exercising that jurisdiction it was nevertheless the duty of the trial court to follow and be guided by the decisions of the highest state court upon the construction of the statute, and upon the question whether as construed the statute violated any provision of the state constitution. The same duty rests upon this court, and it has been so determined from the earliest period of its history. If the act of the state legislature as construed by its highest court conflicts with the Federal Constitution or with any valid act of Congress, it is the duty of the Circuit Court and of this court to so decide, and to thus enforce

the provisions of the Federal Constitution. The following are some of the numerous cases in which this principle has been announced and carried into effect: *Shelby* v. *Guy,* 11 Wheat. 361; *Nesmith* v. *Sheldon,* 7 How. 812; *Van Rensselaer* v. *Kearney,* 11 How. 297; *Webster* v. *Cooper,* 14 How. 488; *Leffingwell* v. *Warren,* 2 Black, 599; *Hagar* v. *Reclamation District No.* 108, 111 U. S. 701, 704; *Detroit* v. *Osborne,* 135 U. S. 492.

We should not be justified in holding the act to be in violation of the state constitution in the face of clear and repeated decisions of the highest court of the State to the contrary, under the pretext that we were deciding principles of general constitutional law. If the act violate any provision, expressed or properly implied, of the Federal Constitution, it is our duty to so declare it; but if it do not, there is no justification for the Federal courts to run counter to the decisions of the highest state court upon questions involving the construction of state statutes or constitutions, on any alleged ground that such decisions are in conflict with sound principles of general constitutional law. The contrary has not been held in this court by the case of *Loan Association* v. *Topeka,* 20 Wall. 655. In that case a statute of Kansas was held invalid because by its provisions the property of the citizen under the guise of taxation would be taken in aid of a private enterprise, which was a perversion of the power of taxation. The case was brought in the United States Circuit Court for the District of Kansas, and was decided by that court in favor of the city. There had been no decision of the highest state court upon the question whether the act violated the constitution of Kansas, and consequently there was none to be followed by the Federal court upon that question. This court held that a law taxing the citizen for the use of a private enterprise conducted by other citizens was an unauthorized invasion of private rights. Mr. Justice Miller said that there were such rights in every free government which were beyond the control of the State. The ground of the decision was as stated, that the act took the property of the citizen for a private purpose, although under the forms of taxation. In thus holding, there was no over-

ruling or refusing to follow the decisions of the highest court of the State respecting the constitution of its own State.

We are, therefore, practically confined in this case to the inquiry whether the act in question, as it has been construed by the state courts, violates the Federal Constitution.

The assertion that it does is based upon that part of the Fourteenth Amendment to the Constitution, which reads as follows: "Nor shall any State deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Referring to the amendment, above quoted, the appellees herein urge several objections to this act. They say, First, that the use for which the water is to be procured is not in any sense a public one, because it is limited to the landowners who may be such at the time when the water is to be apportioned, and the interest of the public is nothing more than that indirect and collateral benefit that it derives from every improvement of a useful character that is made in the State. Second. They assert that under the act in question the irrigation of lands need not be limited to those which are in fact unproductive, but that by its very terms the act includes all lands which are susceptible of one mode of irrigation from a common source, etc., no matter how fertile or productive they may already be, and it is denied that the furnishing of a fertilizer for lands of individual proprietors which are already productive, in order to make them more productive, is in any legal sense a public improvement. Third. It is also objected that under the act the landowner has no right to demand and no opportunity is given him for a hearing on the question whether his land is or can be benefited by irrigation as proposed; also, that he has no right to a hearing upon the question whether the statute has been complied with in the preliminaries requisite to the formation of the district. Fourth. That the basis of assessment for the cost of construction is not in accordance with and in proportion to the benefits conferred by the improvement. And, finally, that land which cannot, in fact, be benefited may yet under the act be placed in one of the irrigation districts and assessed upon its value to pay the cost of

construction of works which benefit others at his expense. These are the main objections urged against the act.

It has often been said to be extremely difficult to give any sufficient definition of what is embraced within the phrase "due process of law," as used in the constitutional amendment under discussion. None will be attempted here. It was stated by Mr. Justice Miller, in *Davidson* v. *New Orleans*, 96 U. S. 97, 104, that there was "abundant evidence that there exists some strange misconception of the scope of this provision as found in the Fourteenth Amendment. In fact it would seem from the character of many of the cases before us and the arguments made in them, that the clause under consideration is looked upon as a means of bringing to the test of the decision of this court the abstract opinions of every unsuccessful litigant in a state court of the justice of the decision against him, and of the merits of the legislation on which such a decision may be founded." Of course, no such jurisdiction exists or is claimed to exist by the parties here. It is at the same time most difficult to set certain and clear bounds to the right of this court and consequently to its duty to review questions arising under state legislation with reference to this amendment as to due process of law.

It never was intended that the court should, as the effect of the amendment, be transformed into a court of appeal, where all decisions of state courts involving merely questions of general justice and equitable considerations in the taking of property should be submitted to this court for its determination. The final jurisdiction of the courts of the States would thereby be enormously reduced and a corresponding increase in the jurisdiction of this court would result, and it would be a great misfortune in each case. *Mobile County* v. *Kimball*, 102 U. S. 691, 704; *Missouri Pacific Railway* v. *Humes*, 115 U. S. 512, 520. We reiterate the statement made in *Davidson* v. *New Orleans, supra*, that "whenever by the laws of the State or by state authority a tax, assessment, servitude or other burden is imposed upon property for the public use, whether it be for the whole State or of some more limited portion of the community, and those laws provide for a mode

of confirming or contesting the charge thus imposed in the ordinary courts of justice, with such notice to the person or such proceeding in regard to the property as is appropriate to the nature of the case, the judgment in such proceedings cannot be said to deprive the owner of his property without due process of law, however obnoxious it may be to other objections."

Coming to a review of these various objections, we think the first, that the water is not for a public use, is not well founded. The question, what constitutes a public use, has been before the courts of many of the States and their decisions have not been harmonious, the inclination of some of these courts being towards a narrower and more limited definition of such use than those of others.

There is no specific prohibition in the Federal Constitution which acts upon the States in regard to their taking private property for any but a public use. The Fifth Amendment which provides, among other things, that such property shall not be taken for public use without just compensation, applies only to the Federal government, as has many times been decided. *Spies* v. *Illinois*, 123 U. S. 131; *Thorington* v. *Montgomery*, 147 U. S. 490. In the Fourteenth Amendment the provision regarding the taking of private property is omitted, and the prohibition against the State is confined to its depriving any person of life, liberty or property, without due process of law. It is claimed, however, that the citizen is deprived of his property without due process of law, if it be taken by or under state authority for any other than a public use, either under the guise of taxation or by the assumption of the right of eminent domain. In that way the question whether private property has been taken for any other than a public use becomes material in this court, even where the taking is under the authority of the State instead of the Federal government.

Is this assessment, for the non-payment of which the land of the plaintiff was to be sold, levied for a public purpose? The question has, in substance, been answered in the affirmative by the people of California, and by the legislative and

judicial branches of the state government.   The people of the State adopted a constitution which contains this provision:

" *Water and Water Rights* — SEC. 1.   The use of all water now appropriated or that may hereafter be appropriated, for sale, rental or distribution, is hereby declared to be a public use and subject to the regulation and control of the State in the manner to be prescribed by law."   Constitution of California, ART. 14.

The latter part of § 12 of the act now under consideration, as amended in March, 1891, reads as follows:

" The use of all water required for the irrigation of the lands of any district formed under the provisions of this act, together with the rights of way for canals and ditches, sites for reservoirs, and all other property required in fully carrying out the provisions of this act, is hereby declared to be a public use, subject to the regulation and control of the State, in the manner prescribed by law."

The Supreme Court of California has held in a number of cases that the irrigation act is in accordance with the state constitution, and that it does not deprive the landowners of any property without due process of law; that the use of the water for irrigating purposes under the provisions of the act is a public use, and the corporations organized by virtue of the act for the purpose of irrigation are public municipal corporations organized for the promotion of the prosperity and welfare of the people.   *Turlock Irrigation District* v. *Williams,* 76 California, 360; *Central Irrigation District* v. *De Lappe,* 79 California, 351; *In re Madera Irrigation District,* 92 California, 296.

We do not assume that these various statements, constitutional and legislative, together with the decisions of the state court, are conclusive and binding upon this court upon the question as to what is due process of law, and, as incident thereto, what is a public use.   As here presented these are questions which also arise under the Federal Constitution, and we must decide them in accordance with our views of constitutional law.

It is obvious, however, that what is a public use frequently

and largely depends upon the facts and circumstances surrounding the particular subject-matter in regard to which the character of the use is questioned.

To provide for the irrigation of lands in States where there is no color of necessity therefor within any fair meaning of the term, and simply for the purpose of gratifying the taste of the owner, or his desire to enter upon the cultivation of an entirely new kind of crop, not necessary for the purpose of rendering the ordinary cultivation of the land reasonably remunerative, might be regarded by courts as an improper exercise of legislative will, and the use might not be held to be public in any constitutional sense, no matter how many owners were interested in the scheme. On the other hand, in a State like California, which confessedly embraces millions of acres of arid lands, an act of the legislature providing for their irrigation might well be regarded as an act devoting the water to a public use, and therefore as a valid exercise of the legislative power. The people of California and the members of her legislature must in the nature of things be more familiar with the facts and circumstances which surround the subject and with the necessities and the occasion for the irrigation of the lands than can any one be who is a stranger to her soil. This knowledge and familiarity must have their due weight with the state courts which are to pass upon the question of public use in the light of the facts which surround the subject in their own State. For these reasons, while not regarding the matter as concluded by these various declarations and acts and decisions of the people and legislature and courts of California, we yet, in the consideration of the subject, accord to and treat them with very great respect, and we regard the decisions as embodying the deliberate judgment and matured thought of the courts of that State on this question.

Viewing the subject for ourselves and in the light of these considerations we have very little difficulty in coming to the same conclusion reached by the courts of California.

The use must be regarded as a public use, or else it would seem to follow that no general scheme of irrigation can be

formed or carried into effect. In general, the water to be used must be carried for some distance and over or through private property which cannot be taken *in invitum* if the use to which it is to be put be not public, and if there be no power to take property by condemnation it may be impossible to acquire it at all. The use for which private property is to be taken must be a public one, whether the taking be by the exercise of the right of eminent domain or by that of taxation. *Cole* v. *Le Grange*, 113 U. S. 1. A private company or corporation without the power to acquire the land *in invitum* would be of no real benefit, and at any rate the cost of the undertaking would be so greatly enhanced by the knowledge that the land must be acquired by purchase, that it would be practically impossible to build the works or obtain the water. Individual enterprise would be equally ineffectual; no one owner would find it possible to construct and maintain water works and canals any better than private corporations or companies, and unless they had the power of eminent domain they could accomplish nothing. If that power could be conferred upon them it could only be upon the ground that the property they took was to be taken for a public purpose.

While the consideration that the work of irrigation must be abandoned if the use of the water may not be held to be or constitute a public use is not to be regarded as conclusive in favor of such use, yet that fact is in this case a most important consideration. Millions of acres of land otherwise cultivable must be left in their present arid and worthless condition, and an effectual obstacle will therefore remain in the way of the advance of a large portion of the State in material wealth and prosperity. To irrigate and thus to bring into possible cultivation these large masses of otherwise worthless lands would seem to be a public purpose and a matter of public interest, not confined to the landowners, or even to any one section of the State. The fact that the use of the water is limited to the landowner is not therefore a fatal objection to this legislation. It is not essential that the entire community or even any considerable portion thereof should directly enjoy or participate in an improvement in order to constitute a

public use. All landowners in the district have the right to a proportionate share of the water, and no one landowner is favored above his fellow in his right to the use of the water. It is not necessary, in order that the use should be public, that every resident in the district should have the right to the use of the water. The water is not used for general, domestic or for drinking purposes, and it is plain from the scheme of the act that the water is intended for the use of those who will have occasion to use it on their lands. Nevertheless, if it should so happen that at any particular time the landowner should have more water than he wanted to use on his land, he has the right to sell or assign the surplus or the whole of the water as he may choose.

The method of the distribution of the water for irrigation purposes, provided for in section 11 of the act, is criticised as amounting to a distribution to individuals and not to lands, and on that account it is claimed that the use for irrigation may not be achieved, and therefore the only purpose which could render the use a public one may not exist. This claim we consider not well founded in the language and true construction of the act. It is plain that some method for apportioning the use of the water to the various lands to be benefited must be employed, and what better plan than to say that it shall be apportioned ratably to each landowner upon the basis which the last assessment of such owner for district purposes within the district bears to the whole sum assessed upon the district? Such an apportionment, when followed by the right to assign the whole or any portion of the waters apportioned to the landowner, operates with as near an approach to justice and equality as can be hoped for in such matters, and does not alter the use from a public to a private one. This right of assignment may be availed of also by the owner of any lands which, in his judgment, would not be benefited by irrigation, although the board of supervisors may have otherwise decided. We think it clearly appears that all who by reason of their ownership of or connection with any portion of the lands would have occasion to use the water, would in truth have the opportunity to use it

upon the same terms as all others similarly situated.   In this way the use, so far as this point is concerned, is public because all persons have the right to use the water under the same circumstances.    This is sufficient.

The case does not essentially differ from that of *Hagar* v. *Reclamation District*, 111 U. S. 701, where this court held that the power of the legislature of California to prescribe a system for reclaiming swamp lands was not inconsistent with any provision of the Federal Constitution.   The power does not rest simply upon the ground that the reclamation must be necessary for the public health.   That indeed is one ground for interposition by the State, but not the only one.   Statutes authorizing drainage of swamp lands have frequently been upheld independently of any effect upon the public health, as reasonable regulations for the general advantage of those who are treated for this purpose as owners of a common property.    *Head* v. *Amoskeag Manufacturing Co.*, 113 U. S. 9, 22 ; *Wurtz* v. *Hoagland*, 114 U. S. 606, 611 ; Cooley on Taxation, 617, 2d ed.   If it be essential or material for the prosperity of the community, and if the improvement be one in which all the landowners have to a certain extent a common interest, and the improvement cannot be accomplished without the concurrence of all or nearly all of such owners by reason of the peculiar natural condition of the tract sought to be reclaimed, then such reclamation may be made and the land rendered useful to all and at their joint expense.   In such case the absolute right of each individual owner of land must yield to a certain extent or be modified by corresponding rights on the part of other owners for what is declared upon the whole to be for the public benefit.

Irrigation is not so different from the reclamation of swamps as to require the application of other and different principles to the case.   The fact that in draining swamp lands it is a necessity to drain the lands of all owners which are similarly situated, goes only to the extent of the peculiarity of situation and the kind of land.   Some of the swamp lands may not be nearly so wet and worthless as some others, and yet all may be so situated as to be benefited by the reclamation, and

whether it is so situated or not must be a question of fact. The same reasoning applies to land which is, to some extent, arid instead of wet. Indeed, the general principle that arid lands may be provided with water and the cost thereof provided for by a general tax or by an assessment for local improvement upon the lands. benefited, seems to be admitted by counsel for the appellees. This necessarily assumes the proposition that water used for irrigation purposes upon lands which are actually arid is used for a public purpose, and the tax to pay for it is collected for a public use, and the assessment upon lands benefited is also levied for a public purpose. Taking all the facts into consideration, as already touched upon, we have no doubt that the irrigation of really arid lands is a public purpose, and the water thus used is put to a public use.

Second. The second objection urged by the appellees herein is that the operations of this act need not be and are not limited to arid, unproductive lands but include within its possibilities all lands, no matter how fertile or productive, so long as they are susceptible "in their natural state" of one mode of irrigation from a common source, etc. The words "in their natural state" are interpolated in the text of the statute, by the counsel for the appellees, on the assumption that the Supreme Court of California has thus construed the act in *Modesto Irrigation District* v. *Tregea*, 88 California, 334. The objection had been made in that case that it was unlawful to include the city of Modesto in an irrigation district. The court, per Chief Justice Beatty, said that the legislature undoubtedly intended that cities and towns should in proper cases be included in irrigation districts, and that the act as thus construed did not violate the state constitution. The learned Chief Justice also said :

" The idea of a city or town is of course associated with the existence of streets to a greater or less extent, lined with shops and stores, as well as of dwelling-houses, but it is also a notorious fact that in many of the towns and cities of California there are gardens and orchards inside the corporate boundaries, requiring irrigation. It is equally notorious that in many dis-

tricts lying outside of the corporate limits of any city or town there are not only roads and highways, but dwelling-houses, outhouses, warehouses, and shops. With respect to these things, which determine the usefulness of irrigation, there is only a difference of degree between town and country. . . . It being equally clear and notorious as matter of fact that there are cities and towns which not only may be benefited by irrigation, but actually have in profitable use extensive systems for irrigating lands within their corporate limits, it cannot be denied that the supervisors of Stanislaus County had the power to determine that the lands comprising the city of Modesto would be benefited by irrigation and might be included in an irrigation district. . . .

" In the nature of things, an irrigation district must cover an extensive tract of land, and no matter how purely rural and agricultural the community may be, there must exist here and there within its limits a shop or warehouse covering a limited extent of ground that can derive no direct benefit from the use of water for irrigation. Here, again, the difference between town and country is one of degree only, and a decision in the interest of the shop owners in towns, that their lots cannot be included in an irrigation district, would necessarily cover the case of the owner of similar property outside of a town. It is nowhere contended by the appellant that in organizing irrigation districts it is the duty of the supervisors to exclude by demarcation every tract or parcel of land that happens to be covered by a building or other structure which unfits it for cultivation, and certainly the law could not be so construed without disregarding many of its express provisions, and at the same time rendering it practically inoperative. We construe the law to mean that the board may include in the boundaries of the district all lands which *in their natural state would be* benefited by irrigation and are susceptible of irrigation by one system, regardless of the fact that buildings or other structures may have been erected here and there upon small lots, which are thereby rendered unfit for cultivation at the same time that their value for other purposes may have been greatly enhanced."

We do not see in this construction, the meaning of which is apparent from the foregoing quotations from the opinion, any substantial difference, favorable to the appellees, from the act without the interpolation of those words.

As an evidence of what can be done under the act it is alleged in the complaint in this suit that the plaintiff is the owner of forty acres of land in the district, and that it is worth $5000, and that it is subject to beneficial use without the necessity of water for irrigation, and that it has been used beneficially for the past several years for purposes other than cultivation with irrigation.    These allegations are admitted by the answer of the defendants, who nevertheless assert that if a sufficient supply of water is obtained for the irrigation of the plaintiff's land, the same can be beneficially used for many purposes other than that for which it can be used without the water for irrigating the same.

What is the limit of the power of the legislature in regard to providing for irrigation?  Is it bounded by the absolutely worthless condition of the land without the artificial irrigation?  Is it confined to land which cannot otherwise be made to yield the smallest particle of a return for the labor bestowed upon it?  If not absolutely worthless and incapable of growing any valuable thing without the water, how valuable may the land be and to what beneficial use and to what extent may it be put before it reaches the point at which the legislature has no power to provide for its improvement by that means? The general power of the legislature over the subject of providing for the irrigation of certain kinds of lands must be admitted and assumed.  The further questions of limitation, as above propounded, are somewhat legislative in their nature, although subject to the scrutiny and judgment of the courts to the extent that it must appear that the use intended is a public use as that expression has been defined relatively to this kind of legislation.

The legislature by this act has not itself named any irrigation district, and, of course, has not decided as to the nature and quality of any specific lands which have been included in any such district.  It has given a general statement as to what

conditions must exist in order to permit the inclusion of any land within a district.  The land which can properly be so included is, as we think, sufficiently limited in its character by the provisions of the act.  It must be susceptible of one mode of irrigation, from a common source and by the same system of works, and it must be of such a character that it will be benefited by irrigation by the system to be adopted.  This, as we think, means that the amount of benefit must be substantial and not limited to the creation of an opportunity to thereafter use the land for a new kind of crop, while not substantially benefiting it for the cultivation of the old kind, which it had produced in reasonable quantities and with ordinary certainty and success, without the aid of artificial irrigation.  The question whether any particular land would be thus benefited is necessarily one of fact.

The legislature not having itself described the district, has not decided that any particular land would or could possibly be benefited as described, and, therefore, it would be necessary to give a hearing at some time to those interested upon the question of fact whether or not the land of any owner which was intended to be included would be benefited by the irrigation proposed.  If such a hearing were provided for by the act, the decision of the tribunal thereby created would be sufficient.  Whether it is provided for will be discussed when we come to the question of the proper construction of the act itself.  If land which can, to a certain extent, be beneficially used without artificial irrigation, may yet be so much improved by it that it will be thereby and for its original use substantially benefited, and, in addition to the former use, though not in exclusion of it, if it can then be put to other and more remunerative uses, we think it erroneous to say that the furnishing of artificial irrigation to that kind of land cannot be, in a legal sense, a public improvement, or the use of the water a public use.

Assuming for the purpose of this objection that the owner of these lands had by the provisions of the act, and before the lands were finally included in the district, an opportunity to be heard before a proper tribunal upon the question of bene-

fits, we are of opinion that the decision of such a tribunal, in the absence of actual fraud and bad faith, would be, so far as this court is concerned, conclusive upon that question. It cannot be that upon a question of fact of such a nature this court has the power to review the decision of the state tribunal which has been pronounced under a statute providing for a hearing upon notice. The erroneous decision of such a question of fact violates no constitutional provision. The Circuit Court in this case has not assumed to undertake any such review of a question of fact.

The difference between this case and the case of *Spencer* v. *Merchant*, 125 U. S. 345, is said by counsel for appellees to consist in the fact that in the *Spencer case* the lands in question might have been benefited, while here the additional benefit to land already capable of beneficial use without irrigation is in no legal or proper sense a benefit which can be considered for the purpose of an assessment. We think this alleged difference is not material. It is in each case one of degree only, and the fact of the benefit is by the act to be determined after a hearing by the board of supervisors. In this case the board has necessarily decided that question in favor of the fact of benefits by retaining the lands in the district. Unless this court is prepared to review all questions of fact of this nature decided by a state tribunal, where the claim is made that the judgment was without any evidence to support it or was against the evidence, then we must be concluded by the judgment on such a question of fact, and treat the legal question as based upon the facts as found by the state board. Due process of law is not violated, and the equal protection of the laws is given, when the ordinary course is pursued in such proceedings for the assessment and collection of taxes that has been customarily followed in the State, and where the party who may subsequently be charged in his property has had a hearing or an opportunity for one provided by the statute. *Kelly* v. *Pittsburg*, 104 U. S. 78.

In view of the finding of the board of supervisors on this question of benefits, assuming that there has been one, this court cannot say as a matter of law that the lands of the

plaintiff in this case have not been or cannot be benefited by this proposed irrigation. There can be no doubt that the board of supervisors (if it have power to hear the question of benefits, as to which something will be said under another head of this discussion) would be a proper and sufficient tribunal to satisfy the constitutional requirement in such case. In speaking of a board of supervisors, Mr. Chief Justice Waite in *Spring Valley Water Works Company* v. *Schottler*, 110 U. S. 347, 354, said : "Like every other tribunal established by the legislature for such a purpose, their duties are judicial in their nature, and they are bound in morals and in law to exercise an honest judgment as to all matters submitted for their official determination. It is not to be presumed that they will act otherwise than according to this rule." In that case the board was to fix the price of water, while in this it is to determine the fact of benefits to lands. The principle is the same in each case.

It may be that the action of the board upon any question of fact as to contents or sufficiency of the petition, or upon any other fact of a jurisdictional nature, is open to review in the state courts. It would seem to be so held in the *Tregea case* decided in 1891. 88 California, 334.

If the state courts would have had the right to review these findings of fact, jurisdictional in their nature, the United States Circuit Court had the same right in this case, but it has not done so, its judgment being based upon the sole ground that the act was a violation of the Fourteenth Amendment of the Federal Constitution. Upon the question of fact as to benefits, decided by the board, it is held in the *Tregea case* that its decision is conclusive. 88 California, *supra*. Whether a review is or is not given upon any of these questions of fact (if the tribunal created by the State had power to decide them, and if an opportunity for a hearing were given by the act), is a mere question of legislative discretion. It is not constitutionally necessary in such cases to give a rehearing or an appeal. *Missouri* v. *Lewis*, 101 U. S. 22 ; *Pearson* v. *Yewdall*, 95 U. S. 294.

Very possibly a decision by the statutory tribunal which in-

cluded tracts of land within the district that plainly could not by any fair or proper view of the facts be benefited by irrigation, would be the subject of a review in some form and of a reversal by the courts, on the ground that the decision was based not alone upon no evidence in its favor, but that it was actually opposed to all the evidence and to the plain and uncontradicted facts of common knowledge, and was given in bad faith. In such case the decision would not have been the result of fair or honest, although grossly mistaken judgment, but would be one based upon bad faith and fraud, and so could not be conclusive in the nature of things. A question of this kind would involve no constitutional element, and its solution would depend upon the ordinary jurisdiction of courts of justice over this class of cases. It is not pretended that such jurisdiction has been invoked or exercised here. As was said by Mr. Justice Miller in *Davidson* v. *New Orleans, supra,* where the objection was made that part of the property was not in fact benefited, "this is a matter of detail with which this court cannot interfere if it were clearly so; but it is hard to fix a limit within these two parishes where property would not be benefited by the removal of the swamps and marshes which are within their bounds." To the same effect, *Spencer* v. *Merchant,* 125 U. S. 345; *Lent* v. *Tillson,* 140 U. S. 316, 333.

In regard to the matters thus far discussed, we see no valid objection to the act in question.

Third. We come now to the question of the true construction of the act. Does it provide for a hearing as to whether the petitioners are of the class mentioned and described in the act and as to their compliance with the conditions of the act in regard to the proceedings prior to the presentation of the petition for the formation of the district? Is there any opportunity provided for a hearing upon notice to the landowners interested in the question whether their lands will be benefited by the proposed irrigation? We think the right to a hearing in regard to all these facts is given by the act, and that it has been practically so construed by the Supreme Court of California in some of the cases, above cited from the reports of that court and in the cases cited in the briefs of

counsel. We should come to the same conclusion from a perusal of the act. The first two sections provide for the petition and a hearing. The petition is to be signed by a majority of the holders of title to lands susceptible of one mode of irrigation, etc. This petition is to be presented to the board of supervisors at a regular meeting, and notice of intended presentation must be published two weeks before the time at which it is to be presented. The board shall hear the same, shall establish and define the boundaries, although it cannot modify those described in the petition, so as to except from the district lands susceptible of irrigation by the same system of works applicable to the other lands in the proposed district, and the board cannot include in the district, even though included in the description in the petition, lands which shall not, in the judgment of the board, be benefited by irrigation by said system.

If the board is to hear the petition upon notice, and is not to include land which will not, in its judgment, be benefited by irrigation by the system, we think it follows as a necessary and a fair implication that the persons interested in or who may be affected by the proposed improvement have the right under the notice to appear before the board and contest the facts upon which the petition is based, and also the fact of benefit to any particular land included in the description of the proposed district.

It is not an accurate construction of the statute to say that no opportunity is afforded the landowner to test the sufficiency of the petition in regard to the signers thereof and in regard to the other conditions named in the act; nor is it correct to say that the power of the board of supervisors is, in terms, limited to making such changes in the boundaries proposed by the petitioners as it may deem proper, subject to the conditions named in the act.

When the act speaks of a hearing of the petition, what is meant by it? Certainly it must extend to a hearing of the facts stated in the petition, and whether those who sign it are sufficient in number and are among the class of persons mentioned in the act as alone having the right to sign the same.

The obvious purpose of the publication of the notice of the intended presentation of the petition is to give those who are in any way interested in the proceeding an opportunity to appear before the board and be heard upon all the questions of fact, including the question of benefits to lands described in the petition. As there is to be a hearing before the board, and the board is not to include any lands which in its judgment will not be benefited, the plain construction of the act is that the hearing before the board includes the question as to the benefits of the lands, because that is one of the conditions upon which the final determination of the board is based, and the act cannot in reason be so construed as to provide that while the board is to give a hearing on the petition it must nevertheless decide in favor of the petitioners, and must establish and define the boundaries of the district, although the signers may not be fifty, or a majority of the holders of title, as provided by the act, and notwithstanding some other defect may become apparent upon the hearing.

This provision that the board "shall establish and define such boundaries" (section 2) cannot reasonably or properly be held to mean that the boundaries must be established notwithstanding any or all of the defects above mentioned have been proved upon the hearing. The language of the sections taken together plainly implies that the board is to establish and define the boundaries only in case the necessary facts appear upon the hearing which the act provides for.

It cannot be supposed that the act, while providing for a hearing of the petition, yet, at the same time, commands the establishment and defining of the boundaries of a district, notwithstanding the fact that the hearing shows a failure on the part of the petitioners to comply with some or all of the conditions upon which the right to organize is placed by the same act.

Such an absurdity cannot be imputed to the legislature. It cannot be doubted that, by the true construction of the act, the board of supervisors is not only entitled, but it is its duty, to entertain a contest by a landowner in respect to the question whether the signers of the petition fulfil the requirements

described in the first section of the act, and if the board find
in favor of the contestant upon that issue, it is the duty of the
board, under the provisions of the statute, to deny the petition
and dismiss the proceedings.   Otherwise, what is the hearing
for?   And if upon a hearing of the question of benefits to
any land described in the petition it appears to the board
that such lands will not be benefited, it is the duty of the
board to so decide, and to exclude the lands from the district.
The inclusion of any lands is, therefore, in and of itself a
determination (after an opportunity for a hearing) that they
will be benefited by the proposed irrigation.

We have said that the Supreme Court of California has
substantially decided these questions in the same way.   This
appears, among others, in the case of the *Modesto Irrigation
District* v. *Tregea,* above referred to.   The court uses this
language in that case:

"The formation of irrigation districts is accomplished by
proceedings so closely analogous to those prescribed for the
formation of swamp-land reclamation districts that the deci-
sions with respect to the latter are authority as to the former,
and we cite as conclusive on this point *People* v. *Hagar,* 52
California, 181; *S. C.* 66 California, 60.   Many decisions to
the same effect are cited in the briefs of counsel, but we deem
it unnecessary to refer to them here."

In the case of *People* v. *Hagar,* 52 California, 171, 182, it
was held that the board of supervisors, on presentation of the
petition, was to hear and determine the question of jurisdic-
tion, and whether the allegations of the petition were true.
An approval and confirmation of the petition and the estab-
lishment of the district was held to be a conclusive judgment
by the board that the lands mentioned and in question were
swamp lands; that the petitioners held the proper evidences
of title thereto, and *that the lands would be benefited by the
reclamation.*   These jurisdictional facts, it was held, must
exist before the district could lawfully be established.

The provision for a hearing in the irrigation act is similar,
and the condition therein that lands which in the judgment
of the board are not benefited shall not be included, renders

the determination of the board including them after a hearing a judgment that such lands will be benefited by the proposed plan of irrigation.

The publication of a notice of the proposed presentation of the petition is a sufficient notification to those interested in the question and gives them an opportunity to be heard before the board. *Hagar* v. *Reclamation District*, 111 U. S. 701; *Lent* v. *Tillson*, 140 U. S. 316; *Paulsen* v. *Portland*, 149 U. S. 30.

The formation of one of these irrigation districts amounts to the creation of a public corporation, and their officers are public officers. This has been held in the Supreme Court of California. *In re Madera Irrigation District*, 92 California, 296; *People* v. *Selma District*, 98 California, 206.

There is nothing in the essential nature of such a corporation, so far as its creation only is concerned, which requires notice to or hearing of the parties included therein before it can be formed. It is created for a public purpose, and it rests in the discretion of the legislature when to create it, and with what powers to endow it.

In the act under consideration, however, the establishment of its boundaries and the purposes for which the district is created, if it be finally organized by reason of the approving vote of the people, will almost necessarily be followed by and result in an assessment upon all the lands included within the boundaries of the district. The legislature thus in substance provides for the creation not alone of a public corporation, but of a taxing district whose boundaries are fixed, not by the legislature, but, after a hearing, by the board of supervisors, subject to the final approval by the people in an election called for that purpose. It has been held in this court that the legislature has power to fix such a district for itself without any hearing as to benefits, for the purpose of assessing upon the lands within the district the cost of a local, public improvement. The legislature, when it fixes the district itself, is supposed to have made proper inquiry, and to have finally and conclusively determined the fact of benefits to the land included in the district, and the citizen has no con-

stitutional right to any other or further hearing upon that question. The right which he thereafter has is to a hearing upon the question of what is termed the apportionment of the tax, *i.e.*, the amount of the tax which he is to pay. *Paulsen* v. *Portland*, 149 U. S. 30, 41. But when as in this case the determination of the question of what lands shall be included in the district is only to be decided after a decision as to what lands described in the petition will be benefited, and the decision of that question is submitted to some tribunal (the board of supervisors in this case), the parties whose lands are thus included in the petition are entitled to a hearing upon the question of benefits, and to have the lands excluded if the judgment of the board be against their being benefited. Unless the legislature decide the question of benefits itself, the landowner has the right to be heard upon that question before his property can be taken. This, in substance, was determined by the decisions of this court in *Spencer* v. *Merchant*, 125 U. S. 345, 356, and *Walston* v. *Nevin*, 128 U. S. 578. Such a hearing upon notice is duly provided for in the act.

Then, as to a hearing upon the question of apportionment, the act, in sections 18, 20 and 21, provides a general scheme for the assessment upon the property included in the district, and it also provides for a notice by publication of the making of such assessment, and an opportunity is given to the taxpayer to be heard upon the question of the valuation and assessment, and to make such objections thereto as he may think proper, and after that the assessors are to decide.

Thus the act provides for a hearing of the landowner both as to the question whether his land will be benefited by the proposed irrigation, and when that has been decided in favor of the benefit, then upon the question of the valuation and assessment of and upon his land included in the district. As to other matters, the district can be created without notice to any one. Our conclusion is that the act, as construed, with reference to the objections considered under this third head, is unassailable.

Fourth. The fourth objection and also the objection above alluded to as the final one, may be discussed together, as

they practically cover the same principle. It is insisted that the basis of the assessment upon the lands benefited, for the cost of the construction of the works, is not in accordance with and in proportion to the benefits conferred by the improvement, and, therefore, there is a violation of the constitutional amendment referred to, and a taking of the property of the citizen without due process of law.

Although there is a marked distinction between an assessment for a local improvement and the levy of a general tax, yet the former is still the exercise of the same power as the latter, both having their source in the sovereign power of taxation. Whatever objections may be urged to this kind of an assessment, as being in violation of the state constitution, yet as the state court has held them to be without force, we follow its judgment in that case, and our attention must be directed to the question whether any violation of the Federal Constitution is shown in such an assessment. Can an *ad valorem* assessment on the land benefited, or, in other words, can such an assessment as is provided for in sections 18, 20, 21 and 22 of the act. be legally levied in such a case as this? Assume that the only theory of these assessments for local improvements upon which they can stand is that they are imposed on account of the benefits received, and that no land ought in justice to be assessed for a greater sum than the benefits received by it, yet it is plain that the fact of the amount of benefits is not susceptible of that accurate determination which appertains to a demonstration in geometry. Some means of arriving at this amount must be used, and the same method may be more or less accurate in different cases involving different facts. Some choice is to be made, and where the fact of some benefit accruing to all the lands has been legally found, can it be that the adoption of an *ad valorem* method of assessing the lands is to be held a violation of the Federal Constitution? It seems to us clearly not. It is one of those matters of detail in arriving at the proper and fair amount and proportion of the tax that is to be levied on the land with regard to the benefits it has received, which is open to the discretion of the state legislature, and with which this court ought

to have nothing to do. The way of arriving at the amount may be in some instances inequitable and unequal, but that is far from rising to the level of a constitutional problem and far from a case of taking property without due process of law.

In the case of *Davidson* v. *New Orleans, supra,* the assessment, with which this court refused to interfere, was for a local improvement (reclaiming swamp lands), and by § 8 of the act of the legislature of Louisiana, passed in 1858, Laws of Louisiana, 1858, 114, such an uniform assessment was levied upon " the superficial or square foot of lands situate within the draining section or district of such board " as would pay for the cost of construction. The effect of this provision was that each foot of land in the whole district paid the same sum as any other foot, although the assessment was founded upon the theory of an assessment for benefits. It was complained that the amount assessed upon plaintiff's lands was excessive, and that part of them received no benefit at all, and it was to that argument that the reply was made that it was a matter of detail so far as this court was concerned, *i.e.*, it was not a constitutional question, and therefore was not reviewable here. 96 U. S. at page 106.

In *Walston* v. *Nevin,* 128 U. S. 578, an assessment was laid upon lands for benefits received from construction of a local improvement, according to the number of square feet owned by the landowner. It was urged that it was not an assessment governed by the amount of benefits received, but was an absolutely arbitrary and illegal method of assessment. This court held the objection not well founded and that the matter was for the decision of the legislature, to which body the discretion was committed of providing for payment of the improvement.

We refer to the case of *Cleveland* v. *Tripp,* 13 R. I. 59, decided in 1880, as one which treats this subject with much ability. The act provided for the construction of a sewer in the city of Providence and directed the laying of an assessment upon the abutting lands of a certain sum for each front foot and another sum for each square foot extending back 150 feet. The claim was made that such a mode of assessment

did not apply the tax in proportion to the benefits received, and was unequal and unfair, and therefore unconstitutional. The court, while admitting the complaints of inequality to be well founded, yet held the act to be within the power of the legislature.

There are some States where assessments under such circumstances as here exist and made upon an *ad valorem* basis have been held invalid, as an infringement of some provision of the state constitution, or in violation of the act under which they were levied. Counsel have cited several such in the briefs herein filed. We do not discover, and our attention has not been called to any case in this court where such an assessment has been held to violate any provision of the Federal Constitution. If it do not, this court can grant no relief.

The method of assessment here provided for may not be the best which could have been adopted in order to accomplish the most equal and exact justice which the nature of the case permits. But none the less we are unable to say that it runs counter to any provision of the Federal Constitution, and we must for that reason hold the objection here considered to be untenable.

An objection is also urged that it is delegating to others a legislative right, that of the incorporating of public corporations, inasmuch as the act vests in the supervisors and the people the right to say whether such a corporation shall be created, and it is said that the legislature cannot so delegate its power, and that any act performed by such a corporation by means of which the property of the citizen is taken from him, either by the right of eminent domain or by assessment, results in taking such property without due process of law.

We do not think there is any validity to the argument. The legislature delegates no power. It enacts conditions upon the performance of which the corporation shall be regarded as organized with the powers mentioned and described in the act.

After careful scrutiny of the objections to this act we are compelled to the conclusion that none of such objections is well taken. The judgment appealed from herein is therefore

*Reversed and the cause remanded to the Circuit Court of the United States for the Southern District of California for further proceedings not inconsistent with this opinion.*

MR. CHIEF JUSTICE FULLER and MR. JUSTICE FIELD dissented.