LESSENBERRY *v.* LITTLE ROCK-PULASKI DRAINAGE DISTRICT No. 2.

4-8311                                              204 S. W. 2d 554

Opinion delivered September 29, 1947.

Rehearing denied October 27, 1947.

*Gerland P. Patten* and *Rose, Dobyns, Meek & House,* for appellant.

*Catlett & Henderson* and *L. P. Biggs,* for appellee.

GRIFFIN SMITH, Chief Justice. The appeal is from a judgment of Circuit Court overruling protests of landowners that benefit assessments in the Drainage District were invalid because the method of assessing was unfair, arbitrary, and discriminatory. It is also insisted that the complaining parties were hampered in efforts to develop their case because of the Court's refusal to compel pro-

duction of data upon which damages for taking land for right-of-way purposes were based.[1]

Appellants' description of the District is that the western boundary is the Missouri Pacific-Rock Island railroads in the eastern part of Little Rock. The north and northeastern boundaries are the Arkansas River, and the eastern, southeastern and southern boundaries are Fourche Creek. The District is partly within and partly beyond city limits.

In their preliminary report Dickinson & White, engineers, who were appointed by the County Court in February 1946, mentioned that the area was within scope of local flood protection in the Arkansas River watershed, as disclosed by maps on file in the office of the U. S. engineer at Little Rock. The War Department had made a conditional allotment of $850,000 on a tentative estimate of $1,200,000 for the entire undertaking. Because of the requirement that a right-of-way be provided without cost to the Federal Government, and in view of further conditions that interior drainage and perpetual maintenance were local obligations, the District was formed as the only practicable means for supplying the difference between allotment and cost. Assessed benefits actually computed were $378,620, with interest at 6%.[2] It was estimated that more than $70,000 in betterments would be on property exempt from District taxation, leaving $300,000 in round figures. A bond issue of $190,000 is proposed.

[1] The District contract with Little Rock Real Estate Board to supply estimates of damages accruing to each property owner whose land would be taken as a right-of-way. There is testimony that approximately sixty representatives of the Board, working separately, made reports. These, seemingly, were compiled for use of the Board in supplying the information sought. A fee of $1,500 was paid for this service, but the individual workers were not compensated.

[2] Requirements of the Government were (a) that the District provide without cost to the United States all lands, easements and rights of way necessary for construction of the levee; (b) alter and construct all bridges required across water courses; (c) hold the United States from damages due to construction work; (d) maintain and operate all works after completion, in accordance with regulations prescribed by the Secretary of War, to include protection of flood-carrying capacity of the channel of the Arkansas River; (e) pay cost of construction and maintenance of interior drainage work necessary to remove surface water.

The District was created under authority of Act 279, approved May 27, 1909, and Acts supplemental or amendatory. It is inferentially conceded that if the exceptions upon which the appeal is predicated cannot be sustained, and if there is not want of due process of law, creation of the District and resulting assessments are legal.

The Commissioners [3] selected Oscar McCaskill and A. L. Wooten to assist in arriving at appropriate betterment assessments, and it is largely upon the testimony of these two that the allegation of arbitrary results is based. Their work was completed in November. [4]

Faced with the requirement that $300,000 be made available, the appraisers adopted the assessment 'rolls used for State and County purpose. From these records they found total valuations to be $1,090,712. Mr. McCaskill, in testifying, said he and Mr. Wooten " . . . arrived at a formula based upon approximately twenty-two per cent. of the State and County assessment as general benefits, plus special benefits, depending on the area and contour." He went on to explain that land higher in elevation than 260 feet was charged only with the general benefit of twenty-two per cent. Land between 250 and 260 feet was thought to be benefited $60 per acre, or $16 per lot, while the lower gradation between 240 and 250 feet was found to be improved to the extent of $80 per acre, or $24 per lot.

It is urged by appellants that effect of this testimony, when considered in connection with other statements by McCaskill, is that some of the land—depending upon contour—was *generally* assessed. This, exclusive of lands exempt, would yield $239,956. To produce the required difference, the property most frequently exposed to overflow was divided into classes and assessed according to what was believed to be protection from the risks of overflows—the lowest in elevation being taxed with a higher benefit than that in the medium contour classification.

---

[3] Commissioners are G. B. Oliver, Jr., Frank B. Gregg, Jr., and Fred J. Venner. They filed statutory oaths of office February 28, 1946.

[4] The work done by McCaskill and Wooten did not extend to right-of-way matters.

It is contended, therefore, that special benefits were added to general benefits in a manner contrary to law.

But *is* this the effect of Mr. McCaskill's testimony? Certainly that would be true if we disregarded other essential facts and decided the case on abstract statements. A somewhat different construction would apply if the testimony is read as a whole.

The basis, says McCaskill, was arrived at because the assessment rolls in question had been used (most of them) over a period of years. They had been "revamped time and again, accepted by the Board of Equalization and property owners," and in other respects more nearly reflected equality and uniformity than any other plan they could apply. Months were spent working on the lists. But, said the witness, "We took into consideration the improved methods of ingress and egress, improved health conditions, improved market facilities, and improved use of the lands. The assessments were made in proportion to benefits accruing to the property as we saw it, but we did not take into consideration future use of the land. This could not be done because it was impossible to tell what that use would be."

While it is true Mr. McCaskill said two bases were used for assessment purposes—general and special,—it seems conclusive that what he intended to convey was that there were two classes of special benefits, one general and amounting to twenty-two per cent., the other applicable especially to lands exposed in a more or less degree to overflows, according to elevation. This construction appears tenable when compared with testimony by the witness that all property in the area would be affected because of improved health conditions, facilitated ingress and egress, and those things of a related nature which attend the type of protection proposed.

The appraisers who testified were representatives of the Commissioners, and there is a legal presumption that the Commissioners, in adopting the report, were in possession of information necessary to determine whether

the methods were fair and the results uniform within the scope of due process.

Appellants cite *Kirst* v. *Street Improvement District No. 120*, 86 Ark. 1, 109 S. W. 526, and the Court's holding in an opinion by Hon. Ashley COCKRILL, Special Judge. "Consideration," he says, "should be given to all facts and circumstances tending to show special benefits received from the improvement not flowing to the community at large." This decision was handed down in March, 1908, before Act 279 of 1909 became law. But assuming that in purpose the objectives were similar, the holding by Judge Cockrill supports validity of methods used by the Commissioners in the case at bar. After stating that any exaction in excess of the special benefits is, to the extent of such excess, a taking of property without compensation, he added: "Notwithstanding these principles so firmly settled, and in spite of *Norwood* v. *Baker,* 172 U. S. 269, 19 S. Ct. 187, 43 L. Ed. 443, it has been repeatedly held by the Supreme Court of the United States and this Court that an Act of the Legislature providing for assessment of the cost of a local improvement according to the value of the property itself is not arbitrary, and is not in conflict with the Constitution. These decisions are based on the principle that it must be assumed that the Legislature, in adopting such a method, has determined that the amount of benefits will accrue in proportion to the value of the property itself, and thus the assessment is still according to benefits, within the meaning of the law."

The Act of 1909 directs Commissioners to assess "the value of the benefits to accrue to each tract" by reason of the improvement.

No point is made by showing that part of the land assessed is above overflow. *Oates* v. *Cypress Creek Drainage District,* 135 Ark. 149, 205 S. W. 293. In that case Mr. Justice HUMPHREYS quoted with approval from *Louisville & Nashville Ry. Co.* v. *Barber Asphalt Paving Co.,* 197 U. S. 430, 25 S. Ct. 466, 49 L. Ed. 819: "The amount of benefit which an improvement will confer upon

particular land, indeed whether it is a benefit at all, is a matter of forecast and estimate.''

In *Carson* v. *St. Francis Levee District,* 59 Ark. 513, 27 S. W. 590, Chief Justice BUNN said that a tract of land embraced within the district might be above overflow and the district's levee would not change that status, ''and yet in various ways it may be benefited.'' Testimony of complaining parties in the Oats case heretofore mentioned was that property of a number of landowners was above overflow from rain or backwater, that no lateral of the system would come in contact with their land, that drainage was not needed, that no health benefits would accrue, and there would be no enhancement in values because of the improvements.

The Oates case goes a step farther and in a sense upholds a general estimate of betterments, for we find this statement: '' . . . The assessors adopted a uniform basis for making assessments on all lands. They uniformly used a benefit basis. For example, they ascertained that the total benefits to accrue to the lands in the Town of Perry would be $10,000, after taking into consideration every element going to make up the total benefit. In order to apportion equitably the total benefit on the town lands to the several tracts therein, a valuation basis was adopted. Likewise, they ascertained that the total benefit to accrue to the lands in the country would be $72,800. . . . A total assessment of the entire benefit to the whole property was entirely feasible and practical and an apportionment of the benefits on any basis was unnecessary.''.

The principle upon which assessments are sustained is not one requiring that all of the elements of betterment be affirmatively or expressly shown. It is enough, under our decisions, if the Commissioners of a district, as reasonable men, and with essential information, conclude that probable result of the undertaking would especially benefit those within the district as a whole. The presumption is that A profits because most of the community will. ''If it be essential or material for the prosperity

of the community, and if the improvement be one in which all the landowners have to a certain extent a common interest, and the improvement cannot be accomplished without the concurrence of all or nearly all of such owners by reason of the peculiar natural condition of the tract sought to be reclaimed, then such reclamation may be made and the land rendered useful to all and at their joint expense. In such cases the absolute right of each individual owner of land must yield to a certain extent or be modified by corresponding rights on the part of other owners for what is declared upon the whole to be for the public benefit." *Fallbrook Irrigation District* v. *Bradley,* 164 U. S. 112, 17 S. Ct. 56, 41 L. Ed. 369. See *Less Land Company* v. *Fender,* 119 Ark. 20, 173 S. W. 407.

Chief Justice HART, in *Standard Pipe Line Company* v. *Index-Sulphur Drainage District,* 173 Ark. 372, 293 S. W. 1031, in referring to *Missouri Pacific Railroad Co.* v. *Sears,* 166 Ark. 104, 265 S. W. 653, said that the Court had expressly held [in that and other cases] that the fact that the special assessment is made upon the whole value of the property as assessed for State and County purposes does not imply that the assessment is not also according to benefits to be derived from the improvements, "Hence it is not an arbitrary method of ascertaining the amount of benefits to assume that they will accrue in proportion to the actual value of the whole property."

We think appellants' argument that assessments are void because they vary in different zones according to separate contours, is answered by Judge Hart in *Selz* v. *McGehee East & West Highway District,* 171 Ark. 423, 284 S. W. 733, where a zoning system was used to govern in assessing benefits against rural lands, and a percentage of the assessed valuation was used for assessing benefits to town property. "No proof appears," says the opinion, "to show that this made the action of the Commissioners arbitrary, and it cannot be said that this method of assessing the benefits to the property shows on its face that the assessment is arbitrary or discriminatory." See *Wilkinson* v. *Road Improvement District,*

141 Ark. 164, 216 S. W. 304; *Bulloch* v. *Dermott-Collins Road Improvement District,* 155 Ark. 176, 244 S. W. 327.

In *Memphis Land & Timber Co.* v. *St. Francis Levee District,* 64 Ark. 258, 42 S. W. 1093, the method used in assessing betterments was an issue. The president of the Board of Equalization testified:

"We took the assessed value of the lands as they appeared on the tax books for State and County taxes, without reference to betterments. Then, as a betterment, we added from five to four hundred per cent., in proportion to depth of overflow. We concluded that the land subject to the deepest overflow would derive the greatest benefit by a levee. We did not take into consideration improvements or cleared lands. The betterments would only be upon the lands, and not upon the improvements. [They] amounted to exactly $2 per acre. . . . We agreed that lands that were nearly or quite valueless received the greatest betterment. We did this from the depth of overflow, and we got the depth by the value for State and County purposes."

Whether, if not bound by our own decisions, we would now hold as a matter of first impression that methods used in the instant case were improper, is beside the point. The Commissioners and lawyers advising them had a right to assume that procedures judicially approved over a long period of time would not be overturned; nor should they.

If it be said that there should have been no objection upon the part of the District to making available to interested parties the figures compiled by agents of the Real Estate Board, still the fact remains that right-of-way payments are not issues here, and if the Commissioners thought that introduction of this extraneous record would tend to confuse, they had a legal right to insist that the work of sixty men and the memoranda they prepared were not essential to or factors in a determination of issues raised by the landowners.

Affirmed.