HARRIS *v.* BLACKBURN.

4-8840                                   219 S. W. 2d 922

Opinion delivered April 25, 1949.

Rehearing denied May 23, 1949.

*House, Moses & Holmes* and *William H. Clark,* for appellant.

*Burke, Moore & Burke,* for appellee.

GRIFFIN SMITH, Chief Justice. Harris and those associated with him in this appeal own land in White River Drainage District of Phillips and Desha Counties. Blackburn is one of the District's three Commissioners. All were made defendants in a suit by landowners who claimed assessments were rendered invalid when original plans were changed; that reassessments were necessary, and that refunds should be made. There were charges, including a failure to publish financial statements.[1]

The Districts as organized in May 1919, under Act 279 of May 27, 1909, as amended, proposed to reclaim more than 169,000 acres, principally in Phillips County in the White River Backwater Area. Intention was to build levees, flood gates, pumping stations, dig drainage ditches, and, generally to make the lands available for cultivation. An example of the impaired condition of some tracts is found in the testimony of Lee Clements who said that in 1933 he bought from the owner 3,600 acres for $240.[2] However, he had an option on

A survey by consulting engineers was filed in October, 1921. The estimated cost was $4,627,265, about $28 per acre. The Commissioners and landowners thought the investment was too great, a view shared by the consultants, who recommended that an attempt be made to procure Federal assistance. In the meantime substantial obligations had been incurred for preliminary work, including the survey. Upon representa-

---

[1] The other Commissioners were R. S. Bronaugh and E. T. Horner.

[2] The lands were charged with delinquent taxes.

more than 20,000 acres at $1 per acre.

tion to Phillips Circuit Court that $25,000 in certificates of indebtedness were outstanding, and that orderly procedure required additional funds,—some to repay landowners for approximately $100,000 they had advanced,—an assessment of benefits filed in May 1922 was confirmed in August. With approval of assessments the Commissioners reported on negotiations for Federal aid, but said it would be necessary to levy taxes for 1923 and 1924 to pay commitments. These representations resulted in a levy of three-fourths of one percent of the assessed benefits, collectible in 1923 and 1924.

Up to this time there was no suggestion of discontent by any landowner. A seven-page stipulation shows virtual unanimity of purpose; and seemingly the delay now complained of was by common consent, based upon hope that Government grants, or independent levee work for which the District would not be bound, might lift enough of the burden to justify the project. In this situation the Commissioners appealed to Maj. Donald H. Connolly, District Engineer at Memphis, who in April 1925 reported to the Mississippi River Commission, and to the Chief of Engineers of the U. S. Army.

The Overton Flood Control Act under which partial relief was finally procured became a law in 1936. Title 33, § 702 J-2, U.S.C.A., specifically refers to the Tributary Levee Location Survey, White River Levee District. Under this plan levee construction was authorized, with express limitations like those mentioned in *Lessenberry* v. *Little Rock-Pulaski Drainage District No. 2*, 211 Ark. 1046, 204 S. W. 2d 554, second footnote.

Appellants say that "after the project was abandoned" the Government constructed a levee along the left bank of White River—western boundary of the District; but neither the evidence nor the agreed statement justifies a finding that abandonment had occurred. After mentioning the indebtedness with which the District was faced in 1922, a stipulation is that ". . . for a period of fourteen years—from 1922 to 1936—the Commissioners, engineers, and attorneys [waged] a

concerted and continuous effort to obtain Government assistance to carry·out the proposed improvements . . ."³

A further agreement is that in complying with the Overton Act, ". . . it became necessary for each landowner to execute an agreement with the District in the nature of an easement across each tract, to the end that the District could be in a position to comply with the terms of the Act of Congress." As a result, "from time to time" during 1937 and 1938, contracts were executed "by each and all of said landowners, including the plaintiffs herein and their predecessors in title." All conveyances made subsequent to the execution of these papers were subject to terms of the grants, deeds having been duly recorded. Large sums of money were spent by the District to meet Government requirements; and, according to the stipulation, more than 37 miles of drainage canals and diversion channels were constructed under agreement with the Government and in compliance with the Overton Act pertaining to "interior" drainage.

In August of 1942 Circuit Court approved a bond issue of $150,000 against assessed benefits of $7,500,000. The order contained a recital that ". . . when additional work can be carried·on, (weather and war conditions permitting) the District will be authorized . . . to borrow additional funds." Jurisdiction was retained ". . . to make other orders . . . as funds may be needed . . . to carry on the drainage and flood control for which the District was organized."

November 21, 1942, Blackburn, as Chairman of the Board, addressed a communication to landowners in which he said that in dealing with the comprehensive problems involved ". . . your Commissioners feel

³ Continuing, the agreed statement says: "During this period [from 1922 to 1936] the Board of Commissioners, the District's agents and employees, attended practically every Flood Control hearing in the House of Representatives and of the Senate of the United States to urge Congress to enact the necessary legislation whereby Federal assistance could be given to carry out the proposed improvements; that the efforts of the Board of Commissioners, its agents and employees, finally successfully culminated in the passage of the Overton Flood Control Act, . . ."

that they should have the advice and suggestions of the property owners who are vitally affected, and to this end we have called a meeting so these questions may be discussed." The meeting was held November 25th. Those who attended were informed that they were to consider policies to be adopted by the Board ". . . in carrying out the over-all drainage program which has been designed, and for which the District has been organized." E. G. Green, the District's engineer, in estimating that "something in the neighborhood" of $200,000 would be required to complete the program, exhibited maps showing drainage canals that were to be constructed. He mentioned that dirt work was costing eight cents a cubic yard, and grubbing three cents—a total of eleven cents per cubic yard. The current tax rate of one-half of one percent yeilded $35,000 annually, an amount "wholly insufficient to carry out the program." However, if with approval of landowners the levy were increased by 25 per cent, ". . . then the work could easily be carried out over a period of years on short-term paper, with borrowings from local banks at very reasonable rates of interest."

The minutes show that in response to these proposals Warfield Rogers, while stressing "the dire need of an adequate drainage system," expressed the view that "this is not the time to carry on the work." The eight-cent price for excavation, he said, was too high. He thought that "after the war" dirt could be removed for not more than four cents, and others agreed with the estimate. Result of the discussions was that, with two exceptions, all voted to discontinue the work ". . . until some future date when it can be done at a cheaper price."

The landowners have appealed from an order sustaining a defense demurrer to all allegations of the complaint except those charging material changes in the plans and the prayer for damages resulting from improvident construction, inexcusable delays, etc. They attack the decree of dismissal from four angles: ʻ(1) Original plans were changed in material respects, rendering the assessment of benefits invalid. (2) Benefit

assessments should have been revised when the Federal Government paid the cost of constructing a main levee. (3) "Piecemeal" construction, and taxes levied for the purpose, are illegal. (4) the complaint stated a cause of action in Chancery.

*First—Plans Not Substantially Changed.* — Appellants are in an anomalous situation in urging that an original plan was altered to their damage when the Government stepped in with five or six million dollars to pay for an indispensable part of the undertaking they first thought would become a charge upon the lands. While admitting changes as the work progressed —some due to the Government's determination that levees should be built at a particular place—the District insists that, in the main, the work has followed the general outline drafted by Harrington, Howard & Ash in 1921. The fourteen-year delay between 1922 and 1936 is shown to have been solicited by landowners who continued to hope during a term partly within the depression period that supplemental assistance would make it possible for the undertaking to be completed as at first conceived.

It is stipulated that none of the appellants excepted to benefit assessments, nor did predecessors in title; and it is undisputed that the law was tracked when the assessments were made. On the face of the record all court orders under which the District was formed, assessments made, or taxes levied, are regular. The attack is therefore an effort to collaterally reach judgments that became final many years ago, and it must fail. *Main* v. *Drainage District No. 2 of Monroe County,* 204 Ark. 506, 162 S. W. 2d 901.

In the forefront of assigned grounds justifying relief are appellants' assertions that construction work was started in the northern or "higher" part of the District; that a borrow pit left by the Government in building the levee serves as a catch-basin; that drainage from north to south causes water to cover lands otherwise free from minor overflows, and instead of being benefited they were actually damaged. But Harris, one of the appellants, admitted on cross-examination that in

respect of the land he owned, nothing could be done without a levee: "Definitely, I am more fortunate because of Government construction . . . than I would have been if compelled to pay for it myself."

If in building a levee plans are materially changed, landowners are not without redress. It is given by statute. (Pope's Digest, § 4476, Ark. Stats. (1947), § 21-517—. There is no contention here that the statutory remedy was invoked. On the contrary, insistence is that appellants are mistaken when they assert that the major plans were departed from. The remedy is mentioned merely to stress the legislative policy of permitting a departure from primary plans and relegating injured persons to compensation as for damages. The section clearly discloses a belief by the lawmakers that a district, once created, should not have its credit impaired, or interests of non-complaining landowners adversely affected, by minority dissents, once the undertaking is definitely launched. Rights given landowners were discussed in an opinion by Judge HART, who said that if, by reason of any change in plans of a drainage district, an assessment become inequitable, the aggrieved person may petition the county court for a reassessment; and, in the absence of fraud, this right precludes resort to equity, and is exclusive. *Hudson* v. *Simonson*, 170 Ark. 243, 279 S. W. 780.

*Second—Necessity for Revising Assessments.*—The appealing landowners urge with considerable force that a reassessment became imperative when the Government "stepped in" and relieved the District to the extent heretofore shown. This would be true if building the levee constituted such a radical change in plans that a materially different undertaking resulted. Answer comes from most of the witnesses, who in discussing the conceptions of 1919-21, testified that a primary levee was required. It was projected under the Connolly plan, so named because of Connolly's coöperative work. Appellees' engineer testified that this plan afforded better protection than the one suggested by Harrington, Howard & Ash. The witness affirmed the District's purpose to first determine the maximum

volume of water, what facilities would be required to effectively deal with it, and an intent to proceed to completion without material deviation from the original scheme.

Levee construction had not been finished when the case was tried. E. G. Green, engineer, testified that slightly more than four miles were yet to be built around the southern end of Old Town Lake, ". . . and the other 36 miles of levee still have to be enlarged from 1½ to 3 feet in grade." The District must construct 75 miles of canals. Present tax receipts yield $35,000 annually. From this income rights-of-way must be furnished, flood gates operated, the partial system maintained, and all expenses met.

*Third—"Piecemeal" Construction.*—The Chancellor's determination that a preponderance of the evidence did not show the work to have been done in such a disconnected way as to prejudice rights of the appellants must be sustained. Minutes of meetings held by the Board were not successfully impeached. They show that the fourteen-year delay was a groping period during which the landowners, if not actually seeking delays, impliedly consented to the inactivity. They were unwilling to abandon the project, so kept the District intact as a legal entity in the hope that Federal help would come. Speculative values of the lands were tied to drainage. Without it most of the acreage was worth little more than timber stumpage, and much was not accessible to roads.

*Fourth—Did the Complaint State a Cause of Action?*—It is not affirmatviely charged that the Commissioners acted fraudulently. Unless this implication necessarily arises from allegations that in spite of assurances work would be pushed as expeditiously as practicable there were mental reservations that it would be unreasonably delayed, a court of equity should not interfere. As a Board, the Commissioners acted under legal authority, and their discretion will not be infringed. It appears, however, that action on the demurrer has become unimportant. Wide range taken by the

testimony touched most issues in the complaint, and brought to the trial Court's attention the material points of controversy.

If full effect be given to apparent purposes of those who attended the November meeting in 1942, two Commissioners who are appellees here were the only attending landowners not willing to delay the work. The Overton Flood Control Act, with its authorization for levee work, had been in effect for more than six years, and the property owners knew then that Federal money was being spent in their behalf. In 1937 and 1938 these men conveyed easements, thereby arraying themselves with the Commissioners in assuring the Government that "drainage facilities made necessary by construction of the levee" would be provided; that the District would acquire and provide without cost to the United States "all flowage and storage rights and easements over, upon, and across the lands and properties within the protected area", etc. Certainly the Government was dealing with the District and with the landowners upon the basis of a definite improvement, to be completed according to plans.

The stipulation is explicit in saying that easement contracts were executed "by each and all of said landowners, *including the plaintiffs herein and their predecessors in title*". Pope's Digest, § 4492, Ark. Stats. (1947), § 21-562, permits property owners in a drainage district to waive the right to resort to courts, and allows them to ". . . absolutely ratify and confirm what has been done by the Board of Commissioners and all other officials with reference to the district". Thereafter they are "forever barred from testing or contesting in [any] way the validity of the proceedings up to that time, the assessments made, or the tax levied for the payment of principle and interest of bonds, or for any other purpose".

The stipulation had the effect of bringing appellants within the terms of the Act when each executed the easement contract, for the implied assurance was that the District existed as a legal entity.

Affirmed.